UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | Crim. No. 23-cr-10236-FDS |
| ) | |
| DAVID S. FINNERTY, ) | |
| ) | |
| Defendant ) | |

## GOVERNMENT'S SENTENCING MEMORANDUM

Defendant David S. Finnerty is scheduled to be sentenced on September 22, 2025. The United States respectfully submits this memorandum in connection with sentencing.

## PRELIMINARY STATEMENT

Massachusetts Bay Transportation Authority (MBTA) Transit Police Department (TPD) Sergeant David S. Finnerty (Finnerty) knew full well that TPD Officer Dorston Bartlett (Bartlett) used excessive force in violation of the United States Constitution when he struck A.W. in the leg three times with a steel, expandable police baton on July 27, 2018. Finnerty saw videos of the assault shortly after it happened, but instead of immediately reporting Bartlett's use of excessive force, Finnerty helped Bartlett falsify an arrest report designed to cover up Bartlett's civil rights crime. Finnerty's attempt to coverup Bartlett's attack on A.W. calls for a significant prison sentence, but the Court must also look beyond that night in 2018 when fashioning an appropriate sentence for Finnerty. And it is the complete story of David S. Finnerty that more than justifies imposition of the government's proposed sentence of 24 months of incarceration and a $25,000 fine.

## BACKGROUND

### A. Finnerty's July 2018 Obstruction Offense

On May 29, 2025, a jury found defendant David S. Finnerty guilty of aiding and abetting the filing of a false arrest report to cover up Bartlett's assault on A.W., in violation of 18 U.S.C. §§ 1519 and 2 (Count One). ECF 116. The evidence at trial established that Finnerty—a TPD Sergeant with 15 years of law enforcement experience—encouraged and helped Bartlett to cover up his egregious violation of A.W.'s civil rights.

Specifically, in the early morning of July 27, 2018, Finnerty was the Officer in Charge (the OIC) for the overnight TPD shift, stationed at TPD headquarters. Finnerty was highly trained in the use of force and defensive tactics by police officers, including constitutional limitations on officer actions. Finnerty's subordinates that night included Bartlett and TPD Officers Paul Clooney (Clooney) and Richard Sieboldt (Sieboldt).

Finnerty admitted at trial that he heard Bartlett radio to TPD Operations twice that night: first at 1:57 a.m., Bartlett radioed that he had ejected a 30-year old black male from the Ashmont MBTA station. Then, at 1:59 a.m., Bartlett radioed that he would "be returning to HQ with one under arrest for assault and disorderly."

By 2:09 a.m., Finnerty was in the TPD booking area with the arrestee, A.W., a homeless man who had fallen asleep on the last train to the Ashmont MBTA station. Finnerty spent 45 minutes with A.W. while he was booked by Sieboldt. During that time, A.W. repeatedly told Finnerty that Bartlett had struck him with a baton and ejected him from the station, and that Bartlett only arrested A.W. later because A.W. had someone call 911 to report that he had been assaulted by a police officer. Notably, A.W.'s claim was consistent with the radio calls Finnerty admittedly heard in real time. A.W., who did not testify at trial, was visibly and audibly upset by

2

his experience, crying and telling Finnerty that he had never been assaulted by a police officer before that day. And Finnerty must have suspected that A.W. was telling the truth, because after A.W. was booked, Finnerty and Sieboldt found Bartlett and asked him why, if he had used his baton, he had not immediately arrested A.W.

Even if Finnerty had initially doubted A.W.'s story, he knew when he saw the videos of the Ashmont incident that A.W. was telling the truth. Finnerty was alerted to the video evidence by Clooney: Clooney had been on the job *less than three years* but knew immediately when he saw the videos that there was an issue with Bartlett's use of force, and he reported that to his supervisor, Finnerty. At Clooney's insistence, Finnerty watched the videos several times with Clooney and Sieboldt. Sieboldt (who had been with TPD *six years*) knew as soon as he saw the videos that Bartlett used excessive force on A.W.[1] Finnerty's testimony that he did not see enough video to make that determination is simply not believable, in light of Clooney's and Sieboldt's testimony.

In fact, just like his more junior subordinates, Finnerty knew as soon as he watched the videos that Bartlett crossed the line. But instead of going to his supervisor and immediately releasing A.W., Finnerty began an hours-long attempt to help Bartlett falsify an arrest report designed to coverup his violation of A.W.'s Constitutional rights.

First, Finnerty reviewed Bartlett's initial draft of the report—which was clearly inconsistent with the radio calls and videos—and instead of telling Bartlett it was false, he told Bartlett to add more details. Then, when Bartlett's revised draft did not include enough

---

[1] TPD Officer Domingo Gonzalez (Gonzalez), who trained Finnerty on the use of force and defensive tactics and who testified at trial as an expert in the use of force, reviewed the Ashmont videos and concluded, based on his training and experience, that the circumstances as depicted in the videos on July 27, 2018 did not justify Bartlett's use of three baton strikes to A.W.'s calf.

3

falsehoods to justify the assault, Finnerty fed Bartlett more lies to include in the report, but he did it over their cell phones so that the calls would not be recorded. Finally, still not satisfied with Bartlett's draft, Finnerty opened a Word document and inputted changes to the report in redline while referencing the TPD's Use of Force Policy on the OIC computer. Finnerty gave his redlined version of the report to Bartlett, for Bartlett to make the changes in the report writing system. Finnerty then closed Word on the OIC computer, without saving the document he created, believing (incorrectly) that there would be no digital trace of his crime. Bartlett made Finnerty's revisions to what would become the final, approved, Arrest Report.

The changes Finnerty admittedly made in redline to the substance of the arrest report elaborated on falsehoods contained in the original draft and added additional falsehoods designed to justify Bartlett's use of baton strikes on A.W. The changes included the addition of facts that were obviously false based on the videos, including that A.W. "jerked" his body, that he displayed "assaultive" and "resisting" behavior, that Bartlett "perceived a threat to [his] immediate safety" when he struck A.W. with the baton, and that Bartlett was trying to place A.W. in custody at the station. Finnerty did not ask Bartlett whether the changes were true or accurate, because he knew they were lies. Finnerty knew Bartlett would make the changes, because Finnerty was the supervisor.

As the OIC, Finnerty approved charges against A.W. including resisting arrest, assault and battery on a police officer, and trespassing. Denied bail, A.W. was detained until TPD supervisors reviewed the videos and ordered that he be released forthwith.

B. **Finnerty's Use of Force History**

The TPD hired Finnerty as a patrol officer in January 2003, and he was promoted to Sergeant in February 2018. Finnerty attended a police academy and in-service trainings where he learned repeatedly about use of force and defensive tactics by law enforcement. Finnerty also received training in report writing, including that arrest reports must be complete and accurate.

Finnerty was no stranger to the use of force. Between January 2008 and November 2017, Finnerty reported that he used force while acting as a police officer ***24 times***. The significance of this high number of force incidents cannot be understated. Bartlett filed one use of defensive tactics report before July 2018, and Clooney, Gonzalez and former TPD Deputy Superintendent Sean Reynolds (Reynolds) ***combined*** filed only 17 use of defensive tactics reports in their careers. Although Finnerty's TPD supervisors found that his prior uses of force were justified, those findings were based solely on the paperwork Finnerty submitted. Given the jury's verdict on Count One, that Finnerty aided and abetted Bartlett in falsifying the arrest report to cover up Bartlett's use of excessive force, those findings are unreliable.

Whether or not his own uses of force were justified, Finnerty absolutely knew a bad use of force when he saw one. But instead of protecting the very person he was sworn to protect—A.W.—he tried to protect a fellow cop.

**SENTENCING GUIDELINES**

Finnerty's United States Sentencing Guidelines (USSG) have been calculated by the United States Probation Office as follows:

| SENTENCING GUIDELINES CALCULATIONS 18 U.S.C. §§ 242, 1519 (Counts 1-3) | |
|---|---|
| Base Offense Level (USSG § 2J1.2) | 14 |
| Abuse of Trust Adjustment (USSG § 3B1.3) | +2 |
| Obstruction of Justice Adjustment (USSG § 3C1.1) | +2 |
| Chapter Four Adjustment (USSG § 4C1.1(a) and (b)) | -2 |
| **TOTAL OFFENSE LEVEL** | **16** |

Because Finnerty is a Criminal History Category I, his USSG imprisonment range under Probation's USSG calculation (*i.e.*, a Total Offense Level of 16), is 21 to 27 months.

Finnerty has objected to both the abuse of trust adjustment (USSG § 3B1.3) and the obstruction of justice adjustment (USSG § 3C1.1). As detailed below, both adjustments apply.

1. Abuse of Trust Adjustment

Finnerty objected to the application of the abuse of trust adjustment presuming that it was applied only because he was in a supervisory role. *See* Presentence Investigation Report (PIR), at 27 (Objection No. 2). However, the adjustment applies in this case not just because Finnerty was a Sergeant, but because he was a police officer.

Under USSG § 3B1.3, "If the defendant abused a position of public or private trust, or used a special skill, in a manner that significantly facilitated the commission or concealment of the offense," the offense level is increased by 2. "Public or private trust," as that term is used in Section 3B1.3, "refers to a position of public or private trust characterized by professional or managerial discretion

(i.e., substantial discretionary judgment that is ordinarily given considerable deference)." USSG § 3B1.3, comment., n. 1.

Being a police officer is inherently a position of public trust, and the commission of a crime by a police officer is an abuse of that trust. *United States v. Rehal,* 940 F.2d 1, 5 (1st Cir. 1991). Although the abuse of trust enhancement does not apply every time a police officer commits a crime, it applies to police officers where, as here, they use the knowledge, intelligence, or access to information gained in that position of trust to significantly facilitate or conceal the crime. *Rehal,* 940 F.2d at 5; *United States v. Innamorati,* 996 F.2d 456, 490 (1st Cir. 1993).

In *Rehal*, the First Circuit affirmed the district court's application of the abuse of trust enhancement to a Salem, Massachusetts police sergeant convicted of narcotics related offenses for his involvement in a narcotics distribution scheme. 940 F.2d at 2. On appeal, the defendant argued that the application of the enhancement was inappropriate because it should not automatically apply to any police officer, and he argued there was no evidence to show he used his position as a police officer to facilitate the commission or concealment of the crime. *Id.* at 5. The court held that, while "a police officer occupies a position of public trust, and the commission of a crime by a police officer constitutes an abuse of that trust," not everyone who abuses a position of public trust is subject to the enhancement. Instead, the court must find that the defendant's position as an officer facilitated the commission or concealment of the crime. *Id.* The court found that the enhancement applied to Rehal because he used the familiarity he had with the investigative process and the other knowledge he gained as a police officer to avoid detection and conceal his distribution activities from other law enforcement agencies. *Id.* at 6.

Similarly, in *Innamorati*, the court upheld the enhancement for a former Massachusetts Registry police officer for his involvement in a drug distribution conspiracy. 996 F.2d at 490. The

7

defendant accessed motor vehicle information in the registry to try and deduce whether one of the other members of the conspiracy was being tailed by the police. *Id.* at 470. The court explained that his position as a police officer was clearly a position of public trust, and even though the defendant was no longer employed by the police department he "abused the access that his former position afforded him." *Id.* The court concluded that it was enough that the defendant's former position made it easier for him to access the registry information to further the conspiracy, even if this information was potentially available to the public. *Id.* Implicitly, knowledge and access to information afforded by a position of trust which is used in the commission of a crime will make the enhancement applicable. *Id.*

Like the defendants in *Rehal* and *Innamorati*, Finnerty's position as a police officer, as well as his position as a Sergeant, meant he knew exactly how to craft a false arrest report to conceal Bartlett's civil rights violation. Specifically, he knew to use terms like "fighting stance" and "assaultive" and "resisting" behavior, and "perceived a threat to my immediate safety." He knew that exaggerating what happened out of view of the Ashmont camera system (on the train car and platform) might cause TPD reviewers to give Bartlett the benefit of the doubt. And he knew to access the TPD Use of Force Policy on the OIC computer and use it as a guide while adding false statements to Bartlett's draft report.

Because of his position, he also knew—or thought he knew—how to keep his fingerprints off the arrest report. He knew not to use the Larimore report writing system to input his edits under his own username. He knew to create Word document on the OIC computer—which many supervisors had and would use—and he knew not to save the document when he was done. Finnerty knew that because he was Bartlett's supervisor, Bartlett would input Finnerty's changes without questioning

8

them. And he knew to have Sergeant Kenny Orcel (Orcel) approve Bartlett's false arrest report, to further distance himself from the crime.

Finnerty used his knowledge and experience as a police officer and his position as a supervisor to craft a false arrest report designed to hide the violation of A.W.'s Constitutional rights and protect a fellow officer, without leaving his digital fingerprints on the arrest report. Because Finnerty's position of trust concealed Bartlett's offense (striking A.W.) and facilitated and concealed Finnerty's offense (aiding in preparing the false arrest report), the Section 2B1.3 enhancement applies.

2. Obstruction of Justice Adjustment

Finnerty objected to the application of the obstruction of justice adjustment on the grounds that he did not testify falsely at trial. *See* PIR, at 28 (Objection No. 3). However, given the jury's verdict and the weight of the evidence contradicting key portions of Finnerty's testimony, the adjustment applies in this case.

Where the trial court determines a defendant committed perjury on the stand, the USSG § 3C1.1 obstruction of justice enhancement should be applied. *United States v. Dunnigan,* 507 U.S. 87, 98 (1993); *United States v. Nagell,* 911 F.3d 23, 32 (1st Cir. 2018); USSG § 2C1.1, comment., n. 1(c). A witness testifying under oath commits perjury "if she gives false testimony concerning a material matter with the willful intent to provide false testimony, rather than as the result of confusion, mistake, or faulty memory." *Dunnigan*, 507 U.S. at 94.

Finnerty testified that Clooney only showed him, Sieboldt and Orcel portions of two of the four Ashmont videos introduced into evidence at trial, that those clips totaled only 60 to 90 seconds, that he watched the clips only once, and that Clooney fast forwarded through other sections of the videos. *See* Transcript of Trial Day 6, Excerpt of David Finnerty Testimony, attached as Exhibit 1, at

9

32-34, 121-124, 138-139. Finnerty's testimony was completely at odds with the testimony of Clooney and Sieboldt, who both told the jury that they watched the videos in their entirety more than once with Finnerty. Moreover, during cross-examination, Clooney maintained that he just let the videos play for Finnerty, he was not stopping and starting them or showing selected "clips." Finnerty's testimony about what he watched was material to whether he would have known that Bartlett's baton strikes were excessive. Specifically, it was Finnerty's testimony that while the short video "clips" he saw one time "looked bad," he did not know for sure that Bartlett's use of force was bad, because he needed more context. *See* Ex. 1 at 35, 124. But both Clooney and Sieboldt maintained that they knew, after seeing exactly what Finnerty saw on the videos, that Bartlett's use of baton strikes on A.W. was excessive.

Finnerty also lied about why he created a Word document with a redlined version of the arrest report, and how Bartlett came to have that document. With respect to the Word document, Finnerty claimed that one reason he created a Word document to mark up the arrest report, rather than make changes in the Larimore system, was because he suffered from "photophobia…an extreme sensitivity to light, so ambient like computer screens, things of that nature. Sometimes they're too bright. It causes pain in my eyes. It makes me have a hard time to focus. It causes pain in my eyes." Ex. 1, at 49-50. However, Finnerty spent several hours testifying under the courtroom lights and looking at a computer screen, apparently without issue. Finnerty also denied under oath that he closed Microsoft Word. Ex. 1, at 66. However, FBI Digital Examiner Samantha Abbott testified that the Word document created by someone using Finnerty's logon information closed at 7:15:00 a.m. *See* Trial Exhibit 27, attached as Exhibit 2. The Manager of TPD's Technical Services Unit, Anand Kolipakkam, testified that someone using Finnerty's username and password logged off the OIC computer at 7:15:19 a.m. *See* Trial Exhibit 22, attached as Exhibit 3. Accordingly, Finnerty

10

closed the Word document without saving it 15 seconds before he logged off the OIC computer. Finnerty created a Word document to communicate his edits to Barlett because he did not want his name in the Larimore system as having edited the report, and because he thought he could shut down Word without saving his draft, and the document would disappear without any trace of his involvement in the arrest report.

Finnerty further lied about the source of the information he added to the arrest report and how the redlined version of the report made its way to Bartlett. Specifically, Finnerty testified that the "edits were based on the step-by-step Officer Bartlett was taking me through, and it was provided by Officer Bartlett himself." Ex. 1, at 56. He further testified that he printed the document and was going to go through it with Bartlett and rewatch the video, but the document disappeared from the printer and the next thing he knew, his edits were in the arrest report. Ex. 1, at 64-65. Bartlett testified that the additions were Finnerty's, that they were not accurate, and that he (Bartlett) had never supplied them to Finnerty. *See* Transcript of Trial Day 3, Excerpt of Dorston Bartlett Testimony, attached as Exhibit 4, at 36-42.

The jury's verdict on Count 1 necessarily meant that they rejected Finnerty's attempt to distance himself from the false statements in the arrest report. Moreover, Finnerty's lies were material to whether he aided and abetting the filing of the false arrest report. Finally, Finnerty's lies were willful and not the result of confusion or mistake—Finnerty lied confidently and without hesitation and never expressed an inability to recall the events of July 27, 2018.

Courts have applied the Section 3C1.1 obstruction enhancement in similar circumstances, and the Supreme Court has affirmed the application. In *United States v. Dunnigan*, the trial court applied the Section 3C1.1 obstruction enhancement to a defendant who testified in her own defense at trial. 507 U.S. at 90. While on the stand, the defendant denied her involvement in a conspiracy to

11

distribute cocaine. *Id.* at 90-91. The district court found that the defendant was untruthful during her testimony because the denial was explicitly rejected by the jury, which found her guilty of conspiracy to distribute cocaine. *Id.* at 90. Therefore, the enhancement was applied. *Id.* at 90. The evidence refuting the defendant's testimony consisted of numerous other witnesses who contradicted her testimony. *Id.* at 95-96. The Supreme Court held that where the district court has made a proper determination that the defendant committed perjury at trial, as the jury verdict and the evidence supported, the Sentencing Guidelines require an enhancement for obstruction of justice. *Id.* at 98.

The First Circuit also has upheld the application of Section 3C1.1 in similar circumstances. In *United States v. Nagell*, the First Circuit affirmed the application of the enhancement where the district court found that the defendant committed perjury at trial. 911 F.3d at 24. The defendant was a sex offender and was charged with knowingly failing to update his registration. *Id.* At trial, the defendant testified in his own defense and stated that he did not update his registration because his case manager had told him that she had taken care of it for him. *Id.* at 26-27. The case manager testified as a rebuttal witness and rejected the defendant's version of events. *Id.* at 27. Following his conviction by the jury, the court found that the defendant had committed perjury in this testimony and therefore applied the obstruction of justice enhancement. *Id.* at 28. The First Circuit affirmed the enhancement because the defendant made willful, material, and false statements at trial. *Id.* The First Circuit further advised that a district court had the ability to make credibility determinations, and where it discredited the defendant's testimony, the enhancement was appropriate. *Id.* Moreover, it was not even necessary that the defendant's testimony directly conflict with the other witnesses' testimony, but merely that a solid foundation of circumstantial evidence point to the conclusion that the defendant lied on the stand. *Id.* at 30.

There is sufficient evidence to find that Finnerty perjured himself on the stand. Accordingly, the obstruction of justice enhancement in Section 3C1.1 should be applied.

### SENTENCING ARGUMENT

"As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark" in determining the appropriate sentence. *See Gall v. United States*, 552 U.S. 38, 49 (2007); *see also Peugh v. United States*, 569 U.S. 530, 549 (2013) (recognizing that the "Guidelines will anchor both the district court's discretion and the appellate review process"). The Guidelines "seek to embody the § 3553(a) considerations, both in principle and in practice." *Rita v. United States*, 551 U.S. 338, 350 (2007). "[I]f the district court decides that an outside-Guidelines sentence is warranted, [it] must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance." *United States v. Crespo-Rios*, 787 F.3d 34, 38 (1st Cir. 2015) (internal quotation marks and citation omitted). The Section 3553(a) factors, which the government discusses below, include the need for the sentence to reflect the seriousness of the offense, promote respect for the law, and provide just punishment; afford adequate deterrence; and protect the public from further criminal conduct by the defendant. *See* 18 U.S.C. § 3553(a).

Taking into account both the Guidelines and the Section 3553(a) factors discussed below, the government respectfully requests that the Court sentence Finnerty to a sentence of 24 months' imprisonment.

### A. The Nature and Circumstances of the Offense, and the Seriousness of the Offense

The seriousness of Finnerty's offense alone—a police sergeant lying to coverup a fellow officer's unjustified and unconstitutional assault of a man in a vulnerable state—warrants a significant jail sentence.

13

As an experienced and highly trained law enforcement officer with 24 use of force incidents under his belt, Finnerty knew where the line was between justified force and criminally excessive force. And he knew Bartlett was well over the line when he hit A.W. in the leg with a police baton at Ashmont Station. But Finnerty did not see A.W. as the victim when he watched the videos of the Ashmont incident, he saw Bartlett as the victim. Finnerty went into action not to protect A.W.'s rights, but to protect the career of a fellow officer. He chose a brother in blue over a member of the public he was sworn to protect.

While A.W. may not meet the USSG definition of a "vulnerable victim," he was very much a victim and his homelessness and substance use disorder, at the very least, made him vulnerable to abuse and a coverup of that abuse. Finnerty recognized A.W.'s vulnerability and tried to take advantage, knowing there was a not slight chance that no one would believe A.W.

Finnerty also discounted Clooney and Sieboldt, the more junior officers who knew that Bartlett had crossed the line. Finnerty's false narrative for the arrest report put those officers in positions where they had to choose between the Blue Wall of Silence and telling the truth. It was pure coincidence that, after committing his crime, Finnerty ran into Reynolds and was forced to tell him there had been a bad use of force on his shift. Had Reynolds not gone to the Dispatch area that morning to check a tap pass, A.W. would have remained in custody for much longer, and Bartlett's use of excessive force would have gone unreported.

The PIR sets forth data regarding sentences imposed in the last five years for offenders sentenced under USSG § 2J1.2 with a total offense level of 16, and the average jail sentence is exactly what the government seeks in this case: 24 months. PIR ¶ 117. What is not clear from the data is whether those defendants pled guilty or went to trial, and what was the nature and seriousness of the offenses. Here, Finnerty lied to cover up Bartlett's crime, and then refused to accept

responsibility for his own offense while shifting blame to Bartlett (for supposedly feeding Finnerty the lies), Clooney (for supposedly not showing Finnerty the whole videos), Reynolds (for not releasing A.W. fast enough), TPD Superintendent Richard Sullivan (for referring the matter to prosecutors and terminating Finnerty's employment), Rachel Rollins (for bringing state, and supposedly federal,[2] charges against him) and George Soros (for supposedly funding Rachel Rollins). *See, e.g.,* Ex. 1; https://www.youtube.com/watch?v=glh4MohQn9w; https://www.givesendgo.com/davefinnertylegaldefense; https://alphanews.org/cop-trial-despite-woke-prosecutor-hypocrisy; Sergeant David Finnerty - Boston, MA - National Center for Police Defense | NationalCenterForPoliceDefense.com; Sergeant David Finnerty - Boston, MA MBTA Transit Police Department - LELDF. Finnerty himself is to blame for trying to cover up the assault of A.W., and his complete disregard for A.W.'s constitutional rights and for the truth warrants a significant jail sentence.

### B. Finnerty's History and Characteristics

Finnerty's history does not excuse any of his actions in this case. He has a supportive and loving family, and he was raised in stable (and at times luxurious) socio-economic circumstances. PIR ¶¶ 64-72. Finnerty has had many advantages in his life, advantages that many defendants who come before this Court for sentencing have lacked.

But Finnerty is a convicted liar, and specific deterrence is a real issue in this case. He lied in his edits to the arrest report, he lied under oath on the stand, and there is a fair inference that he lied in at least some of the 24 use of defensive tactics forms he filed over the years. Mere loss of a job,

---

[2] The Indictment was returned in August 2023, after Rollins resigned and under then-Acting U.S. Attorney Joshua Levy.

pension and reputation will not be enough to prevent Finnerty from lying again where it serves his personal needs; a significant jail sentence is required.

### C. The Need for General Deterrence

Finally, the Court should sentence Finnerty to a significant prison term to deter other law enforcement officers—and particularly supervisors—from lying about violations of citizens' civil rights. Police misconduct has long been a problem across the nation, and numerous recent cases show that courts have taken the issue seriously. *See, e.g., United States v. Hoar*, 22-10324-ADB (police officer sentenced to 33 months for striking arrestee with baton without justification and lying on police reports to cover up use of excessive force); *United States v. Lamond*, 23-cr-00177-ABJ (former D.C. Metropolitan Police Lieutenant sentenced to 18 months for lying to federal agents about communications with target of investigation). Moreover, defendants who were not police officers have faced significant prison sentences where they lied to cover up civil rights violations. *See, e.g., United States v. Giannakakis*, 21-cr-10271-PBS (brother of man suspected of setting fires at Jewish institutions sentenced to 42 months after pleading guilty to obstructing hate crimes investigation).

It was Finnerty's duty, as a police officer and as a police sergeant, to protect the public. Instead, he abused his badge by attempting to cover up Bartlett's assault of A.W. Finnerty's actions only contribute to the community's distrust of police, but the Court in sentencing Finnerty has an opportunity to show the community that obstructing federal investigations into criminal violations of individual civil rights will not be tolerated, and in fact will be punished appropriately.

## CONCLUSION

David S. Finnerty lied to cover up his subordinate's obviously excessive use of force against a homeless man whose only crime was falling asleep on the last Red Line train to Ashmont Station. Finnerty has never taken responsibility for his crime, and in fact blatantly lied about it to the jury at trial. Accordingly, the Court should impose a sentence of 24 months in prison.

Respectfully submitted,

LEAH B. FOLEY
United States Attorney

*/s/ Kristina E. Barclay*
Kristina E. Barclay
Julien M. Mundele
Assistant United States Attorneys

Dated: September 15, 2025

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

*/s/ Kristina E. Barclay*
Kristina E. Barclay
Assistant United States Attorney

Date: September 15, 2025