UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | No. 1:23-cr-10236 |
| DAVID FINNERTY | |

**DEFENDANT DAVID FINNERTY'S**
**MEMORANDUM IN AID OF SENTENCING**

Defendant David Finnerty, through his counsel, respectfully submits this memorandum in connection with his sentencing scheduled for September 22, 2025. Finnerty requests that this Honorable Court impose a below-guidelines sentence of 24 months of probation pursuant to 18 U.S.C. § 3553(a)(2). In light of the nature of the offense, his personal history, and the need for sentencing parity, the requested sentence is "sufficient, but not greater than necessary" to comply with the purposes of the Sentencing Reform Act.

**PROCEDURAL BACKGROUND**

In March of 2019, Finnerty was charged in Suffolk Superior Court with two counts of False Report by Public Employee (Counts 1 and 2), and one count of Accessory after the Fact (Count 3). These charges related to precisely the same conduct as in the instant case. In October, 2022, the Commonwealth filed a nolle prosequi and the state charges were dismissed. *See* Exhibit A. The Commonwealth stated that it had "learned of new, exculpatory evidence which fundamentally changed its understanding of the case against the defendant":

> Prior to the discovery of this evidence, the Commonwealth firmly believed the defendant was the author of numerous false statements made in a police report which appeared to justify a police officer's misuse of force. This new evidence

1

establishes that, although the defendant did revise some portions of the report, the defendant was not the source of the false and misleading statements that are at issue in this case.

*****

[W]ith respect to the officer's description of the use of force, the defendant's revisions were either: (1) not provably false, or (2) not false in a manner known by the defendant to be untrue, or (3) not false in a material matter, or (4) irrelevant to the charged criminal conduct. As this new evidence weakens the Commonwealth's ability to prove the defendant acted with criminal intent, and in light of previously disclosed evidence related to the defendant's intent (including his disclosure of the misuse of force to a supervisor on the morning of the incident), the Commonwealth cannot prove beyond a reasonable doubt the defendant acted with the intent necessary to sustain these charges.

*Id.*

On August 30, 2023, Finnerty was charged with two federal offenses in the present case: (1) Aiding and Abetting the Falsification of a Record in a Matter Within the Jurisdiction of a Federal Agency, in violation of 18 U.S.C. §§ 2 & 1519; and (2) Falsification of a Record in a Matter Within the Jurisdiction of a Federal Agency, in violation of 18 U.S.C. § 1519. The next day, he was arrested by federal authorities. He was released on personal recognizance, and has complied with all court-ordered conditions of release. (Finnerty also fully complied with conditions during the 3.5 years in which his prior case was pending in Suffolk County Superior Court.)

A jury trial took place in May of 2025. Finnerty testified in his defense, and, as discussed in more detail *infra,* presented the same evidence that led the Commonwealth to enter a nolle prosequi. On May 29, he was found guilty on Count 1 and was acquitted on Count 2.[1]

In the PSR, Probation sets forth the following calculation:

1. a base offense level of 14, pursuant to USSG §2J1.2(a);

---

[1] Finnerty has filed a motion for judgment of acquittal pursuant to Fed. R. Crim. P. 29(c) on the sole count of conviction, which remains under advisement.

2. increasing the offense level by 2, because the offense involved abuse of a position of trust pursuant to USSG §3B1.3;

3. increasing the offense level by 2, for obstruction of justice – specifically, false testimony at trial - pursuant to USSG §3C1.1;

4. decreasing the offense level by 2, because Finnerty qualifies as a zero-point offender pursuant to USSG §4C1.1(a).

PSR ¶¶43-51. This yields a total offense level of 16. PSR ¶52. With a Criminal History Category of I, the advisory guideline range calculated by Probation is 21 to 27 months. PSR ¶103.

## ARGUMENT

**I.   Applicable Law**

Under *United States v. Booker*, 543 U.S. 220, 259 (2005), the sentencing guidelines are no longer mandatory. The Sentencing Reform Act is viewed as requiring the Court to consider guidelines ranges, *see* 18 U.S.C. § 3553(a)(4), but permits it to tailor the sentence in light of other statutory concerns. These concerns include reflecting the seriousness of the offense, promoting respect for the law, providing just punishment, affording adequate deterrence, protecting the public, and effectively providing the defendant with needed educational or vocational training and medical care. 18 U.S.C. § 3553(a). Section 3553(a) further directs sentencing courts to consider the nature and circumstances of the offense; the history and characteristics of the defendant; the kinds of sentences available; the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct; and the need to provide restitution to any victims of the offense. *Id.*[2]

---

[2] Under *Booker,* this Court may consider certain factors that are rejected or ignored by the guidelines. Sentencing courts previously were forbidden from considering, inter alia, a defendant's history and characteristics to the extent that they involved his mental and emotional condition,

3

The sentencing court must compute the guidelines, which are the "starting point and the initial benchmark," but which may not be presumed reasonable. *Gall v. United States*, 552 U.S. 38, 49-51 (2007). Then, the court considers the parties' arguments, after which it makes an "individualized assessment based on the facts presented," considering all the factors under 18 U.S.C. § 3553(a). *Id.* Ultimately, the sentencing judge must select a sentence within the statutory range that is "sufficient, but not greater than necessary" to satisfy the varied purposes of punishment identified by Congress. 18 U.S.C. § 3553(a)(1); *see also* 18 U.S.C. § 3553(a)(2).

The First Circuit has summarized the central principles of the post-*Booker* and *Gall* sentencing procedure described above:

> This sequencing necessitates a case-by-case approach, the hallmark of which is flexibility. In the last analysis, a sentencing court should not consider itself constrained by the guidelines to the extent that there are sound, case-specific reasons for deviating from them. Nor should a sentencing court operate in the belief that substantial variances from the guidelines are always beyond the pale. Rather, the court "should consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue."

*United States v. Martin,* 520 F.3d 87, 91 (1st Cir. 2008) (quoting *Gall*, 552 U.S. at 52).

## II.    Advisory Guidelines Calculation

### A. Abuse of trust

Probation's calculation applies a 2-level enhancement under USSG §3B1.3 for abuse of trust because "the defendant utilized his position of public and private trust as a supervisor within the police department, with limited oversight, to prepare a shift report with false information that would facilitate concealment of his involvement in the preparation of a fraudulent police report,

---

USSG § 5H1.3; his education and vocational skills, *id.* at § 5H1.2; drug or alcohol dependence, *id.* at § 5H1.2; socioeconomic status, *id.* at § 5H1.10; or lack of guidance as a youth, *id.* at § 5H1.12. These factors now can support a sentence outside the guidelines.

4

as well as the underlying use of force incident inaccurately described therein." PSR ¶47. Application of this enhancement would be improper for several reasons.

First, preparing the shift report cannot be used as the basis for the adjustment because it did not serve to significantly facilitate commission or concealment of the offense.

> For this enhancement to apply, the position of trust must have contributed in some significant way to facilitating the commission or concealment of the offense (e.g., by making the detection of the offense or the defendant's responsibility for the offense more difficult). This adjustment, for example, would apply in the case of an embezzlement of a client's funds by an attorney serving as a guardian, a bank executive's fraudulent loan scheme, or the criminal sexual abuse of a patient by a physician under the guise of an examination.

USSG §3B1.3 Application Note 1. While it is uncontroverted that a police officer occupies a position of public trust, not everyone who abuses a position of public trust is subject to the § 3B1.3 adjustment. *United States v. Rehal*, 940 F.2d 1, 5 (1st Cir. 1991). "Rather, the guideline allows for enhancement only if the defendant's abuse was rendered in a manner that significantly facilitated the commission or concealment of the offense." *Id. See also United States v. Reccko*, 151 F.3d 29, 31 (1st Cir. 1998) ("Consistent with this application note's stated method, we have directed sentencing courts to conduct a two-step inquiry into the possible applicability of an enhancement under § 3B1.3. First, the court must determine whether the defendant occupied a position of trust at all. If not, the inquiry ends and no enhancement accrues. If, however, this initial query produces an affirmative response, the court must proceed to ascertain the extent to which the defendant used that position to facilitate or conceal the offense.").

Here, nothing about Finnerty's position affected his ability to commit the underlying offense of covering up Officer Dorston Bartlett's conduct in arresting Anthony Watson. While Finnerty's responsibilities as duty supervisor included preparation of the overnight shift report, that report could have played no role in concealing or facilitating the offense or his own role within

5

it. The report itself was a summary of events occurring during the shift. That the evidence moderately conflicted as to whether Finnerty alerted his supervisor slightly before or slightly after the report was emailed to the command staff is irrelevant, given the uncontroverted evidence that Finnerty verbally shared his suspicions about Bartlett's conduct shortly after his supervisor's arrival at the Transit Police Department (TPD) headquarters, while Bartlett's arrest report was still in draft status, and approximately one hour before the overnight shift he was supervising ended.

The same is true of Bartlett's final arrest report, which Bartlett submitted <u>after</u> Finnerty reviewed several drafts, questioned Bartlett extensively and could not reconcile it with video showing Bartlett's misconduct -- which prompted him to raise concerns up the chain of command, resulting in internal discussion and review by multiple members of the TPD Command Staff. *Compare id.* at 31-33 (enhancement improperly applied to police receptionist who tipped off narcotics dealer to impending search). *Contrast United States v. Innamorati*, 996 F.2d 456, 489-490 (1st Cir. 1993) (defendant "abused the access his former position [as registry police officer] provided him" to perform license plate checks for drug conspiracy, warranting application of enhancement).

The Government's memorandum in response to Finnerty's objections to the PSR appears to rely on a different basis for the enhancement than does Probation. It points not to the shift report, but to the conduct of the underlying offense: "only police officers write police reports." Application of the enhancement on this basis would be both duplicative and nonsensical: Finnerty's position as a police officer did not "significantly facilitate" his ability to help a fellow officer falsify a report, it was what made it possible in the first place.[3]

---

[3] That Probation and the Government cannot seem to agree on which conduct actually involved abusing the position of trust placed in Finnerty as a police officer should mitigate against applying the enhancement.

Furthermore, the record contains significant exculpatory evidence vitiating application of this enhancement – evidence that resulted in the nolle prosequi of equivalent state charges. Specifically, the trial record shows that Finnerty raised concerns directly to his supervisors about the accuracy of Bartlett's report and Bartlett's use of force. Again, before the end of his shift, he personally advised his supervisor, Deputy Chief Sean Reynolds, that Bartlett's use of force at Ashmont Station appeared to be "excessive" and his report lacked probable cause to arrest and appeared problematic ("worse than Garvey").[4] This took place *before* Bartlett's Patrol Supervisor Kenneth Orcel signed off on the report and Bartlett submitted final copy to his superiors. Moreover, Officer Bartlett never recanted or disavowed his version of events of what he repeatedly claimed had happened inside the subway car and on the subway platform, leaving Finnerty to rely on his subordinate's account of events that took place outside his presence and in the absence of complete video surveillance.

Indeed, Reynolds conceded "it was a result of" Finnerty raising concerns about Bartlett's misconduct that caused him to look into the events at Ashmont Station. *See infra,* pp. 15-17. At the same time, in response to Watson claiming during booking that Bartlett had assaulted him, Finnerty directed TPD dispatch to summons Boston EMS to headquarters to examine Watson; the examination was videotaped, preserved, and played for the jury. Also, Finnerty directed Bartlett to archive video (repeatedly played for the jury) of the events at Ashmont station which included Bartlett striking Watson on the leg three times with an expandable metal baton.[5]

---

[4] The Garvey case was a prior use of force involving baton strikes by a former TPD patrol officer, which Reynolds investigated and determined to be excessive, unjustified, and unlawful.

[5] Reynolds acknowledged on cross-examination that station video that is not preserved is usually deleted after thirty days.

In short, Finnerty's response to Bartlett's offenses was whistleblowing, not a cover-up – in particular, privately his alerting the former Chief of the TPD Internal Affairs Unit and current "Blue Team" (excessive force review) Administrator that Bartlett's use of force appeared excessive and improper. These actions are wholly inconsistent with using his supervisory role to conceal misconduct.

Moreover, preparation of the overnight shift report constitutes acquitted conduct. Consideration of such conduct now is prohibited from sentencing determinations under the Commission's Amendment 826, effective November 1, 2024. Section §1B1.3 (Relevant Conduct) has been amended to exclude acquitted conduct from the factors used to determine the guideline range: it "seeks to promote respect for the law by addressing some of the concerns that numerous commenters have raised about acquitted-conduct sentencing, including those involving the 'perceived fairness' of the criminal justice system." Amendment 826, quoting *McClinton v. United States*, 143 S. Ct. 2400, 2401 (2023) (Sotomayor, J., Statement respecting the denial of certiorari) (also discussing concerns that consideration of acquitted conduct to increase the guideline range undermines the historical role of the jury and diminishes "the public's perception that justice is being done, a concern that is vital to the legitimacy of the criminal justice system," and "ero[des] the jury-trial right and enlarges the already formidable power of the government) (internal citations omitted). "Acquittals have long been 'accorded special weight,' distinguishing them from conduct that was never charged and passed upon by a jury…" *Id.* at 2402.

In short, it cannot be concluded by a preponderance of the evidence that the preparation of the shift report significantly facilitated the offense. Application of the enhancement disregards Finnerty's conduct in disclosing his concerns to his superior officer and risks punishing him merely for holding a supervisory role. Accordingly, it should be rejected in this case.

8

B. **Obstruction of Justice**

Probation's calculation applies a 2-level enhancement for obstruction of justice under USSG §3C1.1, on the ground that Finnerty's trial testimony that Bartlett went through the police report with him line by line was false. PSR ¶¶38, 39, 48. This, too, is improper, as Application Note 7 advises against application of this enhancement to offenses sentenced under the base offense level set forth in § 2J1.2 as inappropriate and duplicative in most circumstances:

> **7. Inapplicability of Adjustment in Certain Circumstances.**--If the defendant is convicted for an offense covered by § 2J1.1 (Contempt), § 2J1.2 (Obstruction of Justice), § 2J1.3 (Perjury or Subornation of Perjury; Bribery of Witness), § 2J1.5 (Failure to Appear by Material Witness), § 2J1.6 (Failure to Appear by Defendant), § 2J1.9 (Payment to Witness), § 2X3.1 (Accessory After the Fact), or § 2X4.1 (Misprision of Felony), this adjustment is not to be applied to the offense level for that offense except if a significant further obstruction occurred during the investigation, prosecution, or sentencing of the obstruction offense itself (e.g., if the defendant threatened a witness during the course of the prosecution for the obstruction offense).

U.S.S.G. § 3C1.1.

The exception set forth in note 7 should not apply here, as Finnerty's trial testimony was neither new nor significant. His explanation of how the document got onto his computer was inextricably intertwined with the offense itself. The jury's guilty verdict did not require that they reject his testimony as to any material matter, only that they disbelieve his disavowal of knowledge and intent. The jury's acquittal on Count 2, alleging that Finnerty falsified the Shift Briefing report, further undermines the notion that he sought to obstruct justice by concealing or falsifying reports.

None of Finnerty's testimony was adequately proven false.[6] Although perjury can be the basis for application of this enhancement, *see United States v. Dunnigan*, 507 U.S. 87, 94–95

---

[6] For example, that eight years after the underlying offense Finnerty may not have recalled a print-out of edits occurring on a different printer is not proven perjury or demonstrably intentional.

9

(1993), there is no clear evidence here that Finnerty ever committed it. The facts were entirely consistent with his testimony, and the jury's guilty verdict was not dependent on believing Bartlett, the author of the false report, over Finnerty.

> A witness testifying under oath or affirmation violates [the perjury] statute if she gives false testimony concerning a material matter with the willful intent to provide false testimony, rather than as a result of confusion, mistake, or faulty memory... Of course, not every accused who testifies at trial and is convicted will incur an enhanced sentence under § 3C1.1 for committing perjury... For these reasons, if a defendant objects to a sentence enhancement resulting from her trial testimony, a district court must review the evidence and make independent findings necessary to establish a willful impediment to or obstruction of justice, or an attempt to do the same, under the perjury definition we have set out.

*Id. See also United States v. Willis*, 940 F.2d 1136, 1140 (8th Cir. 1991) ("The adjustment cannot be given simply because a defendant testifies on his own behalf and the jury disbelieves him. The district court itself must find that the defendant committed perjury before making the upward adjustment. No enhancement should be imposed based on the defendant's testimony if a reasonable trier of fact could find the testimony true.").

Unlike other cases where the enhancement has been applied, here neither extrinsic evidence nor self-contradiction shows that Finnerty was lying about Bartlett coming to his desk to seek help with the report. His testimony is contradicted only by a single self-serving, unreliable witness: Bartlett himself, the perpetrator of the underlying abuse of force. *Contrast*, *e.g., United States v. Colby*, 882 F.3d 267, 273-274 (1st Cir. 2018) (defendant's denials of presence at crime scene or touching gun was self-contradictory as well as contrary to testimony of multiple witnesses and supported enhancements); *United States v. Batista-Polanco*, 927 F.2d 14, 21-22 (1st Cir. 1991) (defendant's trial testimony, proven false, of how long he was in building was proper basis for application of enhancement in drug conspiracy trial).

10

Neither is perjury necessarily implied by the jury's findings: whether Bartlett had actually come to Finnerty for help was not necessary or even important to whether he knew that the report he was editing was false.[7] *Contrast United States v. Villarman-Oviedo*, 325 F.3d 1, 16 (1st Cir. 2003) (jury's verdict "perforce" required determination that defendant's testimony was false). The jury easily could have accepted Finnerty's testimony about Bartlett coming to him for help at the same time that it believed Finnerty knew full well what he was doing when he provided it. Put another way, adjudging his protestations of innocence to have been at best willful blindness is the only thing necessarily implied by the jury's guilty verdict. This does not support a finding that Finnerty committed perjury.

The Guidelines commentary "instructs the sentencing judge to resolve in favor of the defendant those conflicts about which the judge, after weighing the evidence, has no firm conviction." *Batista-Polanco*, 927 F.2d at 22. This should be one such case. Here too, the burden of proof is not satisfied: the enhancement for obstruction of justice is unsupported and should not be applied.

### III. Under the Sentencing Reform Act, A Sentence of Time Served Is Sufficient, But Not Greater Than Necessary, To Comply With The Statutory Purposes.

After determining the guideline range, this Court then considers whether the statutory factors warrant an ultimate sentence above or below the guideline range. *Jiménez-Beltre,* 440 F.3d at 518-19; USSG §1B1.1(a)–(c) (courts shall first determine the guideline range, then consider the departure policy statements, then consider the 18 U.S.C. § 3553(a) factors as a whole). The Supreme Court has emphasized that § 3553(a) is more than a laundry list of discrete sentencing

---

[7] Other portions of Finnerty's testimony alleged by the Government to be perjurious, such as Finnerty's statement about having photophobia, have even less claim to materiality. In any event, that migraine-related medical condition is documented by Probation in the PSR, ¶¶79-80.

11

factors; rather, it is a tapestry of factors, through which runs the thread of an overarching principle. *United States v. Rodríguez,* 527 F.3d 221, 228 (1st Cir. 2008) (citing *Kimbrough v. United States,* 552 U.S. 85 (2007)). That tenet -- the "parsimony principle" -- instructs "district courts to 'impose a sentence sufficient, but not greater than necessary' to accomplish the goals of sentencing." *Id.* (quoting 18 U.S.C. § 3553(a)). Here, a downward variance to time served would fulfill the goals set forth in section 3553(a), including punishment, deterrence, and proportionality with similarly situated defendants.

### A.   Personal history

Finnerty has brought commitment and passion to a long career in law enforcement. He joined the Coast Guard in 2000; he served active duty in Maine for two years, then was honorably discharged. This service left him with significant chronic physical injuries: spinal stenosis, a condition where the spine narrows and creates pressure on the spinal cord and nerve roots; neuropathy, i.e. nerve damage, in his right arm; calcification in his right shoulder, causing pain and decreased mobility; and a brachial plexus injury. While Finnerty has undergone surgery and physical therapy at the VA Hospital, the deterioration of his arm strength and mobility are permanent. [8] He also suffers from chronic migraines and photophobia. PSR ¶¶77-80; *See also* Department of Veterans Affairs Service-related Disabilities Sheet, attached as Ex. E.

Following his Coast Guard service, Finnerty entered the police academy, graduating in 2003. He went on to earn a bachelor's degree in criminal justice from Curry College in 2011, and his Master of Science degree from Northeastern University in 2019. Finnerty's twenty years in the MBTA Police Department included promotion to sergeant. PSR ¶¶90-93.

Former law enforcement colleagues describe him as being "consistently dedicated to

---

[8] In its closing, the Government appeared to mock Finnerty's documented disabilities.

serving and protecting the community" and observe that "his commitment to serve is rooted in his desire to make a positive impact and contribute to the well-being of others." *See* collected letters of support, attached at Exhibit B. Elizabeth Dumas, a colleague for over ten years, writes:

> David was a well-respected police officer of great integrity who could always be counted on to do the right thing. Fellow police officers could always depend on him in answering calls for service, providing backup in dangerous situations, and investigating crimes. He was a hard worker who upheld fairness and respect in all interactions regardless of the circumstance. It was a great joy to see a police officer like David be promoted to Sergeant.

*Id.* Another former coworker, Jacob Green, notes Finnerty's "integrity and fortitude," attesting that "I have only witnessed David act with compassion, kindness and intelligence while working with him." *Id.*

William Fleming, an MBTA Police Commander who worked with Finnerty, states that he "always showed a commitment to serving and protecting the most vulnerable that ride and seek refuge on the MBTA," and "always demonstrated compassion and treated everyone especially the unhoused with fairness and respect regardless of the circumstances." Yet another colleague, James Witzgall, writes, "Finnerty is one of the most hardworking individuals I have encountered. He approaches his professional responsibilities with a seriousness of purpose, reliability, and discipline. His colleagues and associates know him to be dependable and conscientious, and his work ethic reflects both personal pride and a sincere commitment to contributing positively to his community." *Id.*

Finnerty is the youngest of four children, raised in a strict but caring household that celebrated the values of honesty, integrity, and community service. *Id.* He enjoys the ongoing support of his siblings, whose letters highlight his evolution from their little brother to an admirable family man. One sister observes, "it fills me with pride to see him as a hands-on father, ensuring my beautiful nieces have only known a loving and present dad."

13

> With over 30 years of experience working with children, particularly those in crisis, I have seen the profound impact that trauma from broken families and absent caregivers can have on young lives. Throughout the challenges of the past seven years, David has consistently prioritized the emotional well-being of his daughters, Emma, Schuyler, and Charolotte, who were just 13, 3, and 8 months old when this case began.

*Id.* During the COVID-19 pandemic when his wife, Jennifer, worked remotely as an elementary school teacher, Finnerty provided stability and support for his children as a primary caretaker. *Id.* Another sister writes that she has seen Finnerty "learn hard lessons, take on responsibilities, and shape himself into a man of integrity."

> Watching him as a father to his three girls, he leads with love and patience. It is not just in the big moments, but the countless small ones too. These are the things that reveal the depth of the father he has become. He has shown that fatherhood is not just about providing but about being present.

*Id.*

The letters submitted by Finnerty's friends and extended family reinforce the picture of Finnerty as an "honorable, dedicated man, and public servant." *Id.* His mother-in-law describes him as "kind, patient, and dependable...a man who puts his family's needs above his own. My granddaughters are blessed to have a father who not only provides for them but also takes an active role in teaching them values of honesty, compassion, and hard work." Indeed, few of the letters fail to mention Finnerty's devoted parenting, most poignantly in his seven-year-old daughter's description of daily rituals of dog-walking, cooking family meals, and reading together. *Id.*

Finnerty currently is employed at the Westboro Swim and Tennis Club, where his manager lauds Finnerty's positive attitude, integrity, and friendliness. Of the more than three thousand employees he has hired amongst his businesses, Justin Lundberg reports Finnerty to be a "spectacular hire":

> When I interviewed Dave for the position, he was up front about the charges he was facing and was apologetic, presuming that the charges would disqualify him from

> attaining the position. On the contrary, his up front and positive attitude were remarkable considering the struggle he and his family were facing, and ultimately his honesty and attitude lead to Dave's hiring. While we had all hoped for a different outcome at trial, we respect the legal process and hope this letter will help provide additional insight into Dave as a person.
>
> He is personable, well liked by all of the patrons and fellow employees, and quickly has become part of the fabric of the business. Dave works full time, but often comes in early to use the gym or facilities with his family. Dave has quickly become friends with the other managers, and is always available to lend a hand if needed in other departments. The most remarkable aspect of Dave is his positive attitude. Not once has he asked anyone to feel sorry for him nor has his attitude conveyed anything less than positivity.

*Id.*

In the words of Finnerty's godparent, his life and career have exemplified the qualities of "honest effort, community dedication, and loyalty." *Id.* His charitable commitments include New England's Wounded Veterans Inc., whose president describes him as a longtime volunteer and urges leniency: "It is uncommon for our organization to provide letters of support to federal judges. However, for this instance we hope mercy is shown to Mr. Finnerty. Without Mr. Finnerty we would have never been able to raise the funds for many severely wounded veterans." *Id.* State Representative David DeCoste sums up Finnerty's role in his community:

> Those who know him best describe him as a devoted husband and father, a reliable friend, and someone who has consistently put the needs of others ahead of his own. He has built a strong family foundation with his wife Jenn and their three children. He has earned the respect of our community. The circumstances that bring Mr. Finnerty before the Court do not reflect the man his community has come to know.

*Id.* The Chief of the Rutland Police Department, Nicholas Monaco, adds that through personal interactions at school and church over the past fifteen years, he has gotten to know Finnerty as "a good father, husband and neighbor" who remains a welcome member of the community.

  **B.**  **Nature and circumstances of the offense**

The trial record in this case contains ample evidence that Finnerty acted without malice, just as the state prosecutor concluded. There is nothing showing that he directed Bartlett to submit a false report, encouraged him to do so, or otherwise intentionally assisted him. On the contrary, the record shows that Finnerty did what any conscientious officer should do: sought as much detail as he could from the reporting officer and, when it still did not reconcile with the available video evidence, directly expressed his concerns to his superior officer. *See supra.* As noted in the Commonwealth's nolle prosequi, this conduct is inconsistent with Finnerty's criminal intent.

Deputy Chief Sean Reynolds testified that on the day of the offense, Finnerty took him aside at the end of his shift to speak to him privately about Bartlett's actions. *See* Trial transcript excerpt at Exhibit C, pp. 40-43. On his own initiative, Finnerty related his concerns about Bartlett's use of excessive force and problematic arrest. *Id.* at pp 90-91, 95. As a result of Finnerty's disclosure, Reynolds looked into Bartlett's misconduct and involved Superintendent Richard Sullivan. *Id.* at pp. 100, 113, 123, 139. Reynolds admitted that had Finnerty not done so, it might have taken him two or three months to learn about the misconduct, and that video of the beating might not have been preserved. *Id.* at p. 140. He also acknowledged Bartlett's report was not final when Finnerty privately shared his concerns about the use of force, and that despite this, he "did not exercise his [supervisory] discretion to stop the report from being finalized." *Id.* at 132.

Bartlett himself testified that he never told Finnerty that his report was false, never stated that any part of his account was untrue, and never disavowed or recanted his narrative claims. Instead – as shown through his testimony and trial exhibits - Bartlett repeatedly asserted verbally to multiple persons (including BPD officers who found Watson lying in the street and complaining of injury, TPD dispatch, personnel present at booking and Finnerty), and affirmed in each of the

16

six draft arrest reports he entered into the Larrimore Report Writing System under his name and badge number that Watson had assaulted him inside the train car and again on the train platform. Moreover, the government failed to prove that Finnerty saw the final version of Bartlett's report; Finnerty testified he never saw it.

In short, the evidence showed that Finnerty effectively functioned as a whistleblower. During the shift, he repeatedly reviewed, edited, and discussed Bartlett's report with him, consistent with protocols for inadequate draft arrest reports submitted for supervisory review (as explained by the government's expert witness, Reynolds, and Finnerty's former supervisor James Witzgall). After giving Bartlett every benefit of the doubt and the opportunity to recant his statements about being assaulted off-camera, Finnerty concluded Bartlett was not telling him the truth about what had happened on the subway platform at Ashmont. He then shared his concerns with his supervisor at his first opportunity. This exculpatory evidence, even though it did not yield a jury acquittal on both counts, merits a below-guidelines sentence.

    C.    **<u>Sentencing proportionality and fairness</u>**

While the government seeks a substantial term of imprisonment for Finnerty, Bartlett -- the individual who actually struck the homeless victim multiples times with his baton -- was sentenced only to probation. Bartlett was indicted in 2019 on state charges of assault and battery with a dangerous weapon, witness intimidation, violating the civil rights of the victim, and filing a false police report in connection with the incident. Suffolk County Superior Court, 1984CR00115. He pleaded guilty in that case to a reduced charge of assault and battery, civil rights violation, and filing a false police report; the charge of witness intimidation was dropped. Bartlett then was sentenced to two years of probation.

The government chose not prosecute Bartlett in federal court, proceeding against only Finnerty.[9] The prosecutor in this case has represented that there was no plea deal and he was not immunized – notwithstanding presenting to the grand jury a video clip (which was also played for the jury) of Bartlett assaulting a handcuffed Watson a second time by grabbing him under his chin and around his neck during booking inside TPD headquarters. In short, the consequences for Bartlett's multiple assaults on a homeless man, as well as violating his civil rights and filing a false police report, was state probation and a free pass on federal prosecution. To impose incarceration on Finnerty, who was not present for the assault at Ashmont Station, did not witness the subsequent assault inside TPD headquarters in real time, did not engage in assaultive behavior, and whose offense conduct was nonviolent and far more constrained, would be egregiously unfair and disproportionate.

Moreover, a sentence of imprisonment would be unduly harsh in the likely event that Finnerty would be serving his time in protective custody or other specialized housing, due to his law enforcement background and the publicity that attended this case. *See* Exhibit D. The conditions of his imprisonment would be more restrictive and onerous than a comparable sentence for a civilian. For a zero-point offender who presents no public safety risk, a sentence of probation adequately serves the purposes of section 3553. Should this Court nonetheless impose any period of incarceration, Finnerty respectfully asks that he be permitted to self-report to the facility to which he is classified within 60 days of the imposition of sentence in order to attend to his medical needs and appointments, address his personal affairs, and administer to the needs of his children.

---

[9] The relevant statutes of limitation had not yet expired as of July 2023, when Finnerty was indicted.

## **CONCLUSION**

For all the foregoing reasons, Finnerty respectfully requests that this Honorable Court impose a sentence of 24 months of probation, and, in light of his financial circumstances, no fine other than the mandatory special assessment of $100.

Dated: September 15, 2025

                              Respectfully submitted,

                              DAVID FINNERTY

                              By his attorney,

                              _/s/ R. Bradford Bailey_

                              R. Bradford Bailey, Esq.
                              BBO No. 549749
                              Brad Bailey Law, P.C.
                              44 School Street, Suite 1000b
                              Boston, MA 02108
                              Tel.: (781) 589-2828
                              Fax: (857) 265-3184
                              brad@bradbaileylaw.com

Certificate of Service

I, R. Bradford Bailey, hereby certify that on this the 15th day of September, 2025, I caused a true copy of the foregoing Memorandum in Aid of Sentencing to be served upon all necessary parties to this matter via ECF.

                              _/s/ R. Bradford Bailey_
                              R. Bradford Bailey, Esq.