# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

———————————————————— )
**UNITED STATES of AMERICA**               )
                                           )          **Criminal Action No.**
**v.**                                      )          **23-10236-FDS**
                                           )
**DAVID FINNERTY,**                         )
                                           )
         **Defendant.**                     )
———————————————————— )

## MEMORANDUM AND ORDER ON DEFENDANT'S MOTION FOR A JUDGMENT OF ACQUITTAL

**SAYLOR, J.**

In May 2025, after a seven-day jury trial, defendant David Finnerty was convicted of aiding and abetting the falsification of a record in violation of 18 U.S.C. §§ 2 and 1519. He was also acquitted of falsifying a record in violation of 18 U.S.C. § 1519. He has moved for a judgment of acquittal.

The charged crime arose out of the use of force by an MBTA transit officer in the early hours of July 27, 2018. At the time, defendant was a sergeant in the MBTA Transit Police Department. The use of force involved baton strikes to the leg of a passenger named Anthony Watson, who was being ejected from the Ashmont station. There was substantial, and essentially uncontradicted, evidence at trial that the use of force was not justified.

The officer who administered the baton strikes, Dorston Bartlett, is not the defendant. Sgt. Finnerty was not present and did not participate in the use of force. Instead, he was at the Transit Police Department headquarters, where he was the duty supervisor for the night shift. The charged crime is based on the creation of a false arrest report by Bartlett and Sgt. Finnerty's efforts to assist him in the preparation of that report.

After the incident, Bartlett arrested Watson and brought him to headquarters for booking. The events at the Ashmont station, including the baton strikes, were largely captured on video, although there was no audio.

A duty officer watched the videos in the monitoring room at headquarters. Based on his concerns as to whether the use of force was justified, he suggested that Sgt. Finnerty watch them as well. Sgt. Finnerty then watched the videos in the presence of three other officers.

Around the same time, Bartlett had begun to prepare a draft report of the incident. His initial draft was skeletal at best. He showed it to Sgt. Finnerty, who told him that the report was not sufficiently detailed. After several back-and-forth exchanges of drafts and comments, Sgt. Finnerty prepared a Word document that he used to cut and paste various changes into Bartlett's draft report.

Most significantly, Sgt. Finnerty's changes included statements that Watson engaged in "assaultive behavior" and that Bartlett "perceived a threat to [his] immediate safety," which by implication would justify the baton strikes. Although those statements were false, Bartlett incorporated the changes in his official report of the incident.

Bartlett testified at the trial that he considered Sgt. Finnerty's changes to be "suggestion[s]." (Trial Tr. Day 3 at 112). He did not discuss the changes with Sgt. Finnerty. When asked why, he testified that "[w]hen a supervisor makes a suggestion when you're writing a report, you usually adhere to that suggestion." (*Id.*). Bartlett eventually pleaded guilty in state court to criminal charges arising out of the incident.

Defendant was convicted of aiding and abetting the falsification of a record within the jurisdiction of a federal agency. *See* 18 U.S.C. §§ 2, 1519. The theory of prosecution was that (1) Bartlett's final report was the relevant record; (2) the record falsely set forth a factual

justification for the use of force; (3) the unauthorized use of force was an actual or potential federal civil-rights violation; (4) the FBI has jurisdiction to investigate such violations; and (5) by proposing the relevant changes to the draft report, defendant aided and abetted the falsification of that record—that is, he had the specific intent to assist Bartlett in committing the crime.

Defendant has moved under Fed. R. Crim. P. 29(c) for a judgment of acquittal, contending that the evidence presented at trial was insufficient for a rational jury to find that he intended to aid and abet the falsification of the report.

There is certainly evidence from which the jury could have concluded that the defendant did not intend to commit the crime. Defendant was a relatively new and inexperienced sergeant, and was working only his second shift as a duty supervisor. He did not actually order Bartlett to make the changes to the report, and indeed did not speak to him about the changes. There was no destruction of evidence; among other things, the videos were not deleted, and defendant testified that he directed that they be preserved.

Nonetheless, the Court cannot say that the evidence was so weak or inconclusive that a judgment of acquittal is required. The critical issue at the center of the case is whether defendant had the necessary intent to aid and abet the creation of a false report. There is sufficient evidence from which a reasonable jury could make such a finding, and therefore the Court will permit the verdict to stand. Accordingly, and for the reasons set forth below, considering the evidence in the light most favorable to the verdict, the motion for a judgment of acquittal will be denied.

## I.    **Background**

The following is a summary of the evidence presented at trial, viewed in the light most favorable to the verdict.

A.    **The Incident**

Sgt. David Finnerty was working at the MBTA Transit Police Department ("TPD") headquarters in Boston during the "last-half" shift, from 11:30 p.m. on July 26 to 7:30 a.m. on July 27, 2018. (Trial Tr. Day 6 at 36). He was assigned to work as the duty supervisor for that shift. (Trial Tr. Day 6 at 37). He had only recently been promoted to sergeant; before that day, he had worked as the duty supervisor only once before, and had shadowed a duty supervisor on one other occasion. (Trial Tr. Day 6 at 37, 96).

In his role as duty supervisor, Sgt. Finnerty was the shift officer-in-charge, and directly supervised all officers stationed at TPD headquarters. (Trial Tr. Day 6 at 66-67). He did not, however, directly supervise any patrolmen; another, more senior sergeant, Kenneth Orcel, was the patrol supervisor during the shift. (Trial Tr. Day 6 at 38).

A veteran TPD officer, Dorston Bartlett, was also working the last-half shift, as a patrol officer in the field. (Trial Tr. Day 6 at 40). Both Bartlett and Sgt. Finnerty testified that their relationship was only professional; they were not friends. (Trial Tr. Day 4 at 12-13; Trial Tr. Day 6 at 39-40).

1.    **Arrest of Anthony Watson**

On the night of July 26-27, Sgt. Finnerty was stationed at the duty supervisor's desk, which was on an elevated platform in the dispatch area. (Trial Tr. Day 6 at 43). He could hear the calls of patrol officers to dispatch as they came in. (*Id.*).

Around 1:45 a.m., Sgt. Finnerty heard a call come in from Officer Bartlett. (Trial Tr. Day 6 at 41). Bartlett reported that he had ejected a man from the Ashmont station. (*Id.*). An ejection—that is, removing a person from MBTA property—is a routine part of the TPD last-half shift. (Trial Tr. Day 4 at 88). Shortly before 2:00 a.m., another call came in from Bartlett,

stating that he was returning to headquarters with "one under arrest for assault and disorderly." (Ex. 6; Trial Tr. Day 6 at 42-43).

A few minutes later, Officer Paul Clooney, who had been working in the station's monitor room, entered the dispatch area. (Trial Tr. Day 6 at 44). He called to Sgt. Finnerty that he had seen an issue in the booking area, and that they should get involved. (*Id.*).[1]

When Clooney and Sgt. Finnerty entered the booking area, Bartlett and the arrestee, a man named Anthony Watson, were arguing with one another. (Ex. 7; Trial Tr. Day 6 at 45). Watson was telling the booking officer, Richard Sieboldt, that he "didn't flee" and "was right here." (Ex. 7). Watson then told Sgt. Finnerty, "Once you watch the security cameras, he's gonna lose his job." (*Id.*). Sgt. Finnerty explained that Watson's lawyer could ask for the station video, but that "[they] don't argue the cases" in booking. (*Id.*). During that exchange, Bartlett left the booking area through the sally port door. (Trial Tr. Day 6 at 46).

While Sieboldt was processing the arrest, Sgt. Finnerty remained in the booking area. Watson, who was agitated, told the officers that Bartlett and another person had "physically thr[own him] out of the train station," and that Bartlett had hit him in the leg. (Ex. 7; Trial Tr. Day 4 at 93). He explained that he had asked a pedestrian to call the police, but as soon as another officer arrived, Officer Bartlett "pull[ed] out of the station and sa[id] I assaulted him." (Ex. 7). Sieboldt asked why Watson wanted to call the police if he had just been with the police. Watson said, "They beat me out of the station. He beat me, but him and the other guy physically threw me out of the station." (*Id.*).

Sgt. Finnerty asked if Watson wanted EMS personnel to look at his leg; Watson said yes.

---

[1] What Clooney saw was Bartlett pinning his handcuffed arrestee to the wall by the neck. (Ex. 7). During the shift, neither Clooney nor the booking officer, Sieboldt, reported to Sgt. Finnerty or to any other supervisor that this had happened.

(Trial Tr. Day 6 at 49).  He remained agitated, continuing to insist that footage of the incident would prove what happened.  Sieboldt expressed skepticism.  (Trial Tr. Day 4 at 92).  In response, while Sgt. Finnerty was on the phone calling EMS, Watson told Sieboldt, "I swear on my kid's grave I am not bullshitting with you."  (Ex. 7).  He then started to cry.  As the booking process progressed, Watson asked, "Why would I have a pedestrian call 911 for no reason?" (*Id.*).

Sgt. Finnerty waited while Watson was evaluated by EMS personnel.  (Trial Tr. Day 6 at 52).  The injury to Watson's leg was a soft-tissue injury and did not require further medical attention.  (*Id.*).

A video of the booking, including audio, was admitted at trial.  (Ex. 7).  There are about 17 minutes of footage, during most of which Sgt. Finnerty is present.

### 2.    Post-Booking Conversation

Around 2:45 a.m., Sgt. Finnerty returned to the dispatch area with Sieboldt.  (Trial Tr. Day 4 at 95).  According to Sieboldt, they went back together to find Bartlett.  (*Id.*).  He testified that when he and Sgt. Finnerty found Bartlett in the report-writing room, his eyes were red, as if he had been crying.  (Trial Tr. Day 4 at 95-96).  He asked Bartlett why he used his baton against Watson if he had not intended to place him under arrest.  (Trial Tr. Day 4 at 96).  Sieboldt did not remember Bartlett's answer.  (*Id.*).

Sgt. Finnerty testified that he saw Bartlett on his way back to the dispatch area and asked him what had happened with Watson.  (Trial Tr. Day 6 at 53).  Bartlett responded that Watson had been violent and combative in the train and on the platform.  (Trial Tr. Day 6 at 54).  Sgt. Finnerty asked Bartlett to make sure the station video was archived.  (*Id.*).  He asked Bartlett if he was telling the truth, and Bartlett said he was.  (Trial Tr. Day 6 at 54-55).

Bartlett testified that Sgt. Finnerty asked him what had happened with Watson before he began writing his report, and that he told him that Watson had been "assaultive" on the train and the platform. (Trial Tr. Day 4 at 33).[2]

### 3. Ashmont Videos

Bartlett testified that just after he left the booking area, he asked Paul Clooney, the monitor-room officer, to pull up footage of the incident from the Ashmont station. (Trial Tr. Day 4 at 33). As the monitor-room officer, Clooney had access to the footage from all MBTA cameras. (Trial Tr. Day 2 at 63-64). Once Clooney located the videos, he watched them alone, and then he watched them again with Bartlett. (Trial Tr. Day 2 at 81; Trial Tr. Day 4 at 33).

Clooney was concerned by what he saw on the videos and went to Sgt. Finnerty to suggest that he watch them. (Trial Tr. Day 2 at 82). That conversation took place a few minutes after 2:40 a.m. (Trial Tr. Day 2 at 82; Trial Tr. Day 6 at 56).

Sgt. Finnerty then watched the videos with Clooney, Sieboldt, and Orcel. (Trial Tr. Day 6 at 60).[3] Clooney, who controlled the video feed, played four videos depicting the episode.[4] (Trial Tr. Day 6 at 60). The first video was of the platform; the second was of the station lobby; and the third and fourth were of the busway outside the station, from different angles. Clooney

---

[2] Bartlett was immunized for his grand-jury testimony, but not for his testimony at trial. (Ex. 43). The government read a portion of Bartlett's grand-jury testimony into the record; in that testimony, he confirmed that at some point he told Sgt. Finnerty that he used his baton because Watson was refusing to leave the station and refusing to follow commands.

[3] According to Clooney, Bartlett was also present, but Sieboldt and Sgt. Finnerty testified that he was not present, and Bartlett did not testify that he watched the video with the larger group. (Trial Tr. Day 2 at 83 (Clooney); Trial Tr. Day 4 at 97 (Sieboldt); Trial Tr. Day 6 at 60 (Finnerty); Trial Tr. Day 4 at 33 (Bartlett)).

[4] Although accounts differ as to which of the videos the group watched, Clooney, Sieboldt, and Sgt. Finnerty agree that they watched the platform video at least once. (Trial Tr. Day 2 at 83 (Clooney); Trial Tr. Day 4 at 97 (Sieboldt); Trial Tr. Day 6 at 61 (Finnerty)). Clooney testified that they also watched the lobby video, but testified that they did not watch the wide-angle view of the busway and could not recall watching the other busway view. (Trial Tr. Day 2 at 83-85). Sieboldt testified that they watched the wide-angle view of the busway, but could not recall watching the lobby video. (Trial Tr. Day 4 at 97-98). Sgt. Finnerty testified that they watched the platform video and both views of the busway, but not the lobby video. (Trial Tr. Day 6 at 61, 152, 150).

played the entirety of each video twice.[5]  He played the videos at normal speed, without pausing or rewinding.  (Trial Tr. Day 6 at 61, 151).

a.    <u>**Platform Video**</u>

In the first video, the camera is positioned near the front car of a parked train on the Ashmont southbound platform.  (Ex. 1).  The line of sight runs parallel to the train and the platform, such that the opposite end of the platform, closest to the last car, is relatively small and not sharply defined.  (*Id.*).  While the frame-rate on the video is relatively low, the image is reasonably clear, except toward the back of the platform.  (*Id.*).  The part of the platform closest to the camera and the very front of the first car are not visible.  (*Id.*).  For most of the video, the train doors are open, leaving some limited parts of the train car visible.  (*Id.*).  There were no cameras inside the train car.  (*Id.*).  There is no audio.  (*Id.*).

The video begins with MBTA Inspector Patrick Goggin entering the first car of the train.  (*Id.*).  He exits soon afterward, throwing a backpack onto the platform.  (*Id.*).  Meanwhile, an MBTA operator gestures for Bartlett, on the platform, to get involved.  (*Id.*).  Bartlett then enters the first car and walks toward the front of the train until he is out of sight.  (*Id.*).  About 40 seconds later, Watson emerges from the train car, followed by Bartlett.  (*Id.*).  They both appear calm.  (*Id.*).  Bartlett turns toward the front of the platform, and moves out of sight of the camera.  (*Id.*).  Watson puts his hood up, and then he, too, moves out of sight.  (*Id.*).

About 20 seconds later, the tops of the men's heads appear on the screen, but their bodies and faces are not visible.  (*Id.*).  Bartlett's head disappears, his hand flashes into view, and then

---

[5]  Accounts also differ as to how long the group spent watching the footage and how many times they watched each video.  Sieboldt testified that they watched the platform video more than once.  (Trial Tr. Day 4 at 97).  Clooney testified that he watched the video footage three or four times over the course of the night, but he watched it once alone and once with Bartlett before watching it with Sgt. Finnerty.  (Trial Tr. Day 2 at 75-76, 81, 83).  Sgt. Finnerty testified that they watched the videos for no more than two minutes.  (Trial Tr. Day 6 at 62).

8

that, too, disappears.  (*Id.*).  After a few seconds, Watson's head moves quickly in and out of view, at a quicker pace.  (*Id.*).

Watson then turns back into view, apparently saying something heated to Bartlett.  (*Id.*).  Bartlett follows him into view of the camera, and grabs the right shoulder of Watson's hoodie with his left hand.  (*Id.*).  By that point, Bartlett is holding his extended service baton in his right hand.  At the same time, the train is pulling out of the station.  (*Id.*).

Watson then attempts to pull away from Bartlett's grasp.  (*Id.*).  He is holding his backpack in his left hand while raising his right elbow, the one closest to Bartlett.  (*Id.*).  His right fist is closed.  (*Id.*).  They struggle somewhat as they move down the platform toward the escalator, which begins about a quarter of the way down the platform.  (*Id.*).  Goggin begins walking toward them from the front of the platform.  (*Id.*).  Watson slows his pace, appearing to drag his feet.  (*Id.*).  As Watson and Bartlett reach a metal column near the bottom of the escalator, Watson drops his bag from his left hand.  (*Id.*).  At that point, either he leans against the column or Bartlett pushes him into the column.  (*Id.*).

For a moment, Watson appears still.  (*Id.*).  Bartlett then swings his baton three times to strike Watson in the leg.  (*Id.*).  Because Watson moves his leg to avoid the baton, it is not clear how many of the strikes connect.  (*Id.*).  Neither Bartlett's face nor Watson's face are visible. (*Id.*).

Watson slides down the column onto the floor.  (*Id.*).  Goggin grabs Watson's backpack. (*Id.*).  Bartlett continues to hold onto Watson's hoodie, and begins yanking him up.  (*Id.*).  Watson stands up.  (*Id.*).  The three of them move around the column and onto the escalator, where they disappear from view.  (*Id.*).

The relevant part of the video lasts about three minutes, including about a minute of footage where neither Bartlett nor Watson are visible. (*Id.*). The entire physical altercation, from the moment Bartlett grabs Watson's hoodie to the final baton strike, lasts about 15 seconds. (*Id.*). The baton strikes themselves happen within a period of three seconds. (*Id.*).

### b. Lobby Video

In the second video, the camera is positioned in the corner above the entrance to the Ashmont station lobby. (Ex. 2). The line of sight runs diagonally across the lobby. (*Id.*). There is grainy footage of the trains, the northbound platform, and the top of the escalator in the top left corner of the frame. (*Id.*). The escalator runs along the same wall as the entrance to the lobby. (*Id.*). The frame-rate on the video is low, and the image is not clear during any relevant footage. (*Id.*). There is no audio. (*Id.*).

For the first 20 seconds of the video, the last southbound train pulls out of the station. (*Id.*). About 25 seconds later, several figures appear on the escalator, moving up. (*Id.*). As they reach the top, it becomes clear that one of the figures is Inspector Goggin, because he is wearing a reflective vest. (*Id.*). As they leave the escalator, Goggin stands on the right side of Watson. (*Id.*). Bartlett emerges from behind Watson and stands to his left. (*Id.*). Bartlett and Goggin walk Watson toward the door. (*Id.*). There is some limited jostling, and then, when they reach the entrance, they appear to shove him out the door. (*Id.*). They then follow him until they are out of view of the camera. (*Id.*).

### c. Busway Videos

The third video is a view of the sidewalk running along the Ashmont busway, immediately outside the station. (Ex. 3). The camera points down along the sidewalk, parallel to the busway. (*Id.*). The busway itself is dark, but the sidewalk is illuminated. (*Id.*). A set of concrete columns lines the edge of the sidewalk. (*Id.*). The inside of the station is not visible,

but the station exit is close to the camera. (*Id.*). The frame-rate is low and the video appears grainy even in the foreground. (*Id.*). There is no audio. (*Id.*).

The video shows Watson emerging from the station. (*Id.*). A hand appears to shove him out of the station door, after which Watson turns around, yells something, and begins walking briskly away, into the busway. (*Id.*). Goggin then exits the station, kicking a safety cone out of his way, yelling something back. (*Id.*). He is followed closely by Bartlett, who continues past Goggin toward Watson. (*Id.*). At that point, Watson is partially obscured by a concrete column, but he appears to throw down his hat and backpack and move further into the busway, turning to face Goggin and Bartlett as he does so. (*Id.*). Goggin runs after Watson, who runs into the dark of the busway. (*Id.*). Bartlett stops to pick up Watson's backpack, and Goggin turns around to pick up Watson's hat. (*Id.*). They are then obscured by the column. (*Id.*). A few moments later, three dark forms can be seen moving through the background, one ahead of the other two. (*Id.*). The forms are difficult to discern, and they eventually disappear again. (*Id.*).

After about 20 seconds, Goggin returns toward the station alone. (*Id.*). About 90 seconds after that, a cruiser pulls into the busway, and the driver's side door opens. (*Id.*). The footage is too dark to discern what, if anything, is happening outside the cruiser. (*Id.*). After several seconds, Goggin comes by and appears to be talking to someone not visible on camera. (*Id.*). He returns to the station, and then the cruiser departs. (*Id.*).

The fourth video is a view of the busway from the other side of the concrete columns. (Ex. 72). Parts of the sidewalk are visible on the edge of the frame, but the focus is on the busway. (*Id.*). There is no audio and the video quality is relatively poor. (*Id.*).

The video depicts the same interaction between Bartlett, Goggin, and Watson, but the view of the busway is not obstructed by the concrete column. (*Id.*). Watson comes into frame

11

on the sidewalk, walks onto the busway, throws down his hat and backpack, and turns around to

yell at Goggin and Bartlett, who are moving toward him. (*Id.*). Bartlett has his baton extended.

(*Id.*). As Goggin and Bartlett approach Watson, he moves away from the camera, but pauses as

Bartlett stops to pick up his backpack. (*Id.*). He walks a few steps toward Bartlett, who throws

his backpack at him. (*Id.*). Watson says something to them, and then Bartlett and Goggin begin

chasing after him, Goggin dropping Watson's hat in the busway as he does so. (*Id.*). Watson

runs away from them, and then turns around to say something else to them. (*Id.*). They continue

toward him. (*Id.*). He then runs out of view, and they continue after him, until they, too,

disappear. (*Id.*).

About 15 seconds later, Goggin walks back into the frame and into the station. (*Id.*).

About 90 seconds later, a cruiser pulls around into the busway. (*Id.*). Bartlett gets out, retrieves

Watson's backpack and hat, and returns to his cruiser, which idles in the busway for 30 or 40

seconds, and then departs. (*Id.*).

### d.    <u>Officers' Reactions</u>

Despite the limitations of the video footage, each officer who viewed the videos on July

27, 2018, including Sgt. Finnerty, concluded that they "looked bad." (Trial Tr. Day 6 at 152).

Clooney testified that he thought there "may [have been] a use of force issue." (Trial Tr. Day 2

at 82). He also testified that Sgt. Finnerty looked surprised watching the videos. (Trial Tr. Day

2 at 87). Clooney also testified that Sgt. Orcel, Bartlett's direct supervisor, "laughed nervously"

at the footage. (*Id.*). Sieboldt testified that Sgt. Orcel said he wanted nothing to do with the

incident and left the area. (Trial Tr. Day 4 at 115).

There was no further discussion among the officers. (Trial Tr. Day 2 at 87). Sgt.

Finnerty then returned to his desk. (Trial Tr. Day 6 at 66).

4.    **Arrest Report**

Barlett began preparing an arrest report using the Larimore incident reporting system used by the TPD.  (Trial Tr. Day 3 at 93, 99-100).  At 3:33 a.m., he saved the first draft of his report.  (Trial Tr. Day 4 at 36; Trial Tr. Day 3 at 14-15).  He testified that he began drafting the report after he had watched the video footage, and that he drafted the report considering the gaps in the videos.  (Trial Tr. Day 4 at 37).

The 3:33 a.m. draft was relatively bare.  According to that draft, when Bartlett ordered Watson to exit the train, Watson "became combative and attempted to assault [him] physically." (Ex. 8 at 1).  The draft stated that on the platform, as Bartlett escorted Watson to the escalator, Watson "again attempted to assault [him], at which time [he] struck the defendant three times in the leg . . . ." (*Id.*).  It further stated that Bartlett attempted to place Watson under arrest in the busway, but that he dropped his backpack and ran away.  (*Id.*).

At 3:35 a.m., Bartlett printed a copy of the draft and brought it to Sgt. Finnerty.  (Trial Tr. Day 4 at 37, 100; Trial Tr. Day 6 at 68).  Sgt. Finnerty told him that the report was not sufficiently detailed.  (Trial Tr. Day 6 at 68).

At 4:12 a.m., Bartlett called Sgt. Finnerty on the desk phone, which was a recorded line, and asked him if he "wanted to take a look at that," meaning the draft.  (Ex. 10).  He responded that he would "look at that right now.  Give me a few minutes." (*Id.*).  Bartlett then said that he could "call [him] on [his] cell, if [Finnerty] want[ed]," to which Finnerty responded, "Okay." (*Id.*).

At 4:13 a.m., Bartlett saved an updated draft of the report.  (Trial Tr. Day 4 at 41-42). The 4:13 a.m. draft added some details to the 3:33 a.m. draft.  (Trial Tr. Day 4 at 42).  Those details included the statement that Watson, on the train, "stated to [Bartlett] 'to get out of my face.'" (Ex. 8 at 1; Trial Tr. Day 4 at 44).  It added that immediately after getting off the train,

Watson "sat down on the platform, refusing to leave." (Ex. 8 at 1; Trial Tr. Day 4 at 45). It also stated that immediately before Bartlett struck Watson, he "began resisting, saying 'get your hands off of me.'" (*Id.*). Finally, it stated that after dropping his backpack in the busway, Watson "started making threats to fight." (Ex. 8 at 1; Trial Tr. Day 4 at 47).

At 4:17 a.m., Bartlett further amended the draft, making small changes that did not affect the substance of the report. (Trial Tr. Day 4 at 50).

At 4:26 a.m., Bartlett emailed Clooney and requested that the footage from Ashmont station be archived. (Trial Tr. Day 4 at 61).[6]

At 4:27 a.m., Bartlett called Sgt. Finnerty again. (Trial Tr. Day 3 at 106). Because the call was between the officers' cell phones, it was not recorded. (*Id.*). The call lasted approximately 30 seconds. (*Id.*). Sgt. Finnerty testified that Bartlett asked him if he had looked at the report yet, and he responded that he had not. (Trial Tr. Day 6 at 70).

At 4:35 a.m., Sgt. Finnerty printed a copy of the 4:17 a.m. report. (Trial Tr. Day 6 at 71).

At 4:46 a.m., Bartlett called him again, also on his cell phone. (Trial Tr. Day 3 at 106). That call was about 30 seconds long. (*Id.*). Sgt. Finnerty testified that he missed that call. (Trial Tr. Day 6 at 70).

At 4:47 a.m., Sgt. Finnerty called Bartlett back, also on his cell phone, and also for about 30 seconds. (*Id.*; Trial Tr. Day 3 at 106). He testified that Bartlett again asked him if he had looked at the report, and he told him he had not, but that Bartlett could come by and they could look at it together. (Trial Tr. Day 6 at 70-71). Bartlett testified that he does not remember the specifics of any of these calls, but that he knew that he was asking Sgt. Finnerty about the report.

---

[6] Unless they are archived, station video recordings are overwritten every 30 days, after which they cannot be recovered. (Trial Tr. Day 6 at 54).

(Trial Tr. Day 3 at 107).  During those calls, Sgt. Finnerty was sitting at the duty supervisor's

desk in the dispatch area with two civilian dispatchers.  (Trial Tr. Day 6 at 81, 105).

    At some point, apparently about 4:50 a.m., Bartlett brought Sgt. Finnerty a copy of a draft

report.  (Trial Tr. Day 6 at 72).  Sgt. Finnerty advised Bartlett that it still lacked important

details.  (*Id.*).  Later, apparently about 5:00 a.m., Bartlett came back with the 4:17 a.m. draft.

(Trial Tr. Day 6 at 74).

    At that point, Sgt. Finnerty opened a Word document and pasted Bartlett's narrative from

the Larimore system into it.  (Trial Tr. Day 6 at 77).[7]  He made several revisions to the report

that were tracked by a redline function.  (Trial Tr. Day 6 at 84-85).  The IT department log shows

that Sgt. Finnerty accessed the department's use-of-force policy at 5:03 a.m.  (Trial Tr. Day 3 at

57-58).  FBI forensic analysis shows that he printed the document he was working on at 5:32

a.m.  (Trial Tr. Day 3 at 51).[8]  The document was last modified at 5:38 a.m.  (Trial Tr. Day 3 at

50-51).

    At some point thereafter, Bartlett went to the duty supervisor's desk.  Sgt. Finnerty

handed him the redlined draft of the report that added many new words and phrases.  (Trial Tr.

Day 3 at 110).  Bartlett did not testify as to what, if anything, Sgt. Finnerty said to him when

---

[7] Sgt. Finnerty testified that he did this with Bartlett present.  (Trial Tr. Day 6 at 77).  He also testified that he opened the TPD use-of-force policy to go over the guidelines with Bartlett, and that he then went line by line through the report, asking Bartlett to describe his experience of the interaction.  (Trial Tr. Day 6 at 79-80, 88).  He testified that Bartlett struggled to come up with sufficiently descriptive words, so Sgt. Finnerty listed phrases to see which ones Bartlett agreed with.  (Trial Tr. Day 6 at 82).  Sgt. Finnerty testified that his edits reflected a collaborative effort between him and Bartlett, but that Bartlett chose the words, and that they reflected Bartlett's description of his experience.  (Trial Tr. Day 6 at 84, 86-87).

    Sgt. Finnerty also remembers asking Bartlett more than once if he was telling the truth, or might be "misremembering" some parts of the incident.  (Trial Tr. Day 6 at 87, 93).  According to him, Bartlett was adamant that he was telling the truth.  (*Id.*).

[8] Sgt. Finnerty testified that he printed the redlined draft so that he could take notes on it.  (Trial Tr. Day 6 at 93).  He testified that he planned to go to the monitor room to watch the videos again with Bartlett, and mark up the report as he did so.  (*Id.*).  He testified that he asked Bartlett to grab a coffee and splash water on his face before they did this.  (*Id.*).

giving him the printout.  (*Id.*).  The document did not have any visible redline or change-tracking

markups.  (*Id.*).  Bartlett left the duty supervisor's desk with the document and did not return.

(Trial Tr. Day 6 at 93).  The two men did not see or speak to one another for the rest of the shift.

(*Id.*).

Sgt. Finnerty did not close out of the redlined draft and did not save it.  (Trial Tr. Day 6

at 94).  The FBI was able to recover an archived, AutoSave version of the document.  (Trial Tr.

Day 3 at 45).  Based on the testimony of an FBI forensic examiner, the fact that an AutoSave

document was created suggests that Sgt. Finnerty neither saved nor deleted the file, and then

Microsoft Word quit unexpectedly, probably when he logged out of his computer.  (Trial Tr. Day

3 at 63-64).[9]

Bartlett testified that he took Sgt. Finnerty's changes—which he referred to as

"suggestion[s]"—and incorporated them into his fourth draft of the report, which was saved in

the Larimore system at 6:30 a.m.  (Trial Tr. Day 3 at 112, 114).

Bartlett's 4:17 a.m. draft report read as follows:

> 1.  On Friday July 27, 2018 at 145 AM, I, Officer Bartlett, (T771) on
> directed patrol at Ashmont station was alerted to the front train car by Red line
> Inspector Patrick Goggin #71946 for a person refusing to get off of the train.  At
> that time I approached the defendant, identified as Anthony Watson, and advised
> him that it was the last stop and that the train was going out of service.  At that
> time I ordered him to get off of the train.  The defendant became combative and
> attempted to assault me physically, stating to me "to get out of my face."  After
> assisting the defendant off of the train, the defendant immediately sat down on the
> platform refusing to leave.  While escorting him to the escalator on the platform,
> the defendant again turned back into my face to assault me, and began resisting,
> saying "get your hands off of me."  At that time I struck the defendant three times
> in the leg with my department issued baton.  While escorting the defendant out of
> the station, with the assistance of the Inspector, we entered the busway and the
> defendant dropped his backpack, started making threats to fight and started
> running away as I was attempting to place him under arrest.  After fleeing the

---

[9] The "bookmark" of the AutoSave document, Exhibit 27, lists the date and time it was "created" as 7:15 a.m., the same time Finnerty logged out of his computer.  (Ex. 21).

station, I returned to my cruiser in the busway. Shortly after fleeing the station, the defendant was spotted in the Peabody Square area at the corner of Dorchester Ave and Ashmont St. where he was placed under arrest with the assistance of Boston Police Officer Wheeler (H436).

2. While being processed in the booking area the defendant complained of leg pain and was evaluated by Boston EMS ambulance #6 by EMTS' #1129 and #933, for minor bruise on the right leg. No further medical treatment needed.

(Ex. 8 at 2).

Sgt. Finnerty's redlined version, last modified at 5:38 a.m., read as follows:

1. On Friday July 27, 2018 at 1:45 AM, I, Officer Bartlett (T771), was on a directed patrol at Ashmont Station. While there I was conducting a sweep of the south platform, when I was alerted by Red line Inspector, Patrick Goggin #71946, for a person refusing to get off of the front train car. At this time service had ended and all patrons must be off the trains and out of the stations in order to close them for the night.

2. At that time I responded to front car, and was directed to the male party who was sleeping inside. I approached the male, later identified as Anthony Watson, woke him, and advised him that it was the last stop and the train was going out of service. I ordered Watson to get off of the train. As I attempted to assist Watson up out of the seat and off the train, he became combative, *jumping up from the seat and lunged his body toward me.* Watson *tensed his muscles, took a fighting stance,* and stated, "Get out of my face!" After I escorted Watson off of the train, and as we exited the train car, Watson immediately sat down on the platform and refused to leave.

3. I took control of Watson and began escorting him to the escalator on the platform. Watson again *jerked his body*, turned back into my face, and began resisting, saying, "Get your hands off of me!" *Watson continued to move, trying to break free from my grasp. Based on Watson's actions, the continued tensing of his muscles, and his assaultive behavior, I perceived a threat to my immediate safety.* At that time I struck Watson three times in the his right lower leg, in his calf muscle area, with my department issued baton. *Watson stopped his assaultive and resisting behavior, and fell to the ground. I regained control of Watson, and he stood up and began to walk out.* With the assistance of Inspector Goggin, we escorted Watson out of the station. As we passed through the doors and entered the busway Watson jerked away from my grasp, dropped his backpack, and started making threats to fight me, *stating, "I got something for you!"* As I stepped towards Watson to place him into custody, he started running away, down the busway.

4. After fleeing the station, I returned to my cruiser in the busway and began an area search. Shortly after, Watson was spotted in Peabody Square, at

the corner of Dorchester Ave and Ashmont St. *I was able to catch up to him* and he was placed under arrest with the assistance of Boston Police Officer Wheeler (H436).

     5.  I transported Watson to Transit Police Headquarters to be booked per department policy.  While being processed in the booking area, the defendant complained of leg pain.  Boston EMS was notified and Ambulance #6 arrived on scene.  Watson was evaluated by Boston EMS Ambulance #6 (EMTS' #1129 and #933) for a minor bruise on the right leg.  Boston EMS determined no further medical treatment was needed and cleared the booking area.

(Ex. 29) (emphasis added to note alterations).

Several of the details added in Sgt. Finnerty's redlined draft were factually incorrect.  For example, Bartlett testified that Watson did not lunge at him or take a fighting stance.  (Trial Tr. Day 3 at 111).  And he testified that he did not fear for his immediate safety on the platform.  (Trial Tr. Day 3 at 113).  Several other added details, however, were apparently true.  For example, Bartlett testified that Watson had in fact jumped up at him on the train.  (Trial Tr. Day 3 at 87).

Bartlett did not say anything to Sgt. Finnerty about any of the added details—that is, he did not tell him they were false, but also did not tell him they were true.  (Trial Tr. Day 3 at 111-112; Trial Tr. Day 4 at 55).  When asked why, Bartlett testified that "[w]hen a supervisor makes a suggestion when you're writing a report, you usually adhere to that suggestion."  (Trial Tr. Day 3 at 112).

The 6:30 a.m. (apparently final) report prepared by Bartlett reflects many of the suggestions from Sgt. Finnerty's 5:38 a.m. redline.  The detailed descriptions of Watson's physical conduct are the same.  However, the 6:30 report contains several typographical errors

that Sgt. Finnerty's redline does not, and there are changes to the description of Watson's flight and arrest.[10]

Both parties agree that Sgt. Finnerty never saw the 6:30 a.m. report or any later report from Bartlett. (Trial Tr. Day 6 at 170). Sgt. Finnerty was not Bartlett's direct supervisor, and was not responsible for approving the report. (*Id.*).

Several TPD officers testified to Sgt. Finnerty's reputation as a person knowledgeable about department use-of-force policies. (Trial Tr. Day 4 at 150-151). At trial, the government introduced 24 of Sgt. Finnerty's own use-of-force reports to demonstrate his experience with writing such reports. (Trial Tr. Day 5 at 71).

### 5.    Shift Briefing

At 6:04 a.m., Sgt. Finnerty sent an email to members of the command staff summarizing the events of the shift. (Ex. 11). That briefing, the "Duty Supervisor/OIC Staff Shift Briefing," was one of the routine responsibilities of Duty Supervisors staffing the last-half shift. (Trial Tr. Day 6 at 94). There were required sections, as well as established norms about what to include in each section. (*Id.*). Former TPD Lieutenant James Witzgall testified that sergeants learned the role of officer-in-charge, including what to include in a shift briefing, over time and through experience. (Trial Tr. Day 6 at 9).[11]

Sgt. Finnerty's shift briefing report stated, in relevant part:

---

[10] The report states that Watson fled "out of" the busway, rather than "down" the busway. (Ex. 8 at 3). And, in contrast to Sgt. Finnerty's redline, the report does not state that Bartlett "was able to catch up to" Watson. (*Id.*).

[11] The expectations for what to include in the briefing were also set out in an email from Deputy Superintendent Preston Horton to all sergeants and lieutenants in 2016, before Finnerty became a sergeant. (Trial Tr. Day 5 at 118). Deputy Superintendent Reynolds testified that there would have been a copy of the email accessible around headquarters for newer sergeants. (Trial Tr. Day 5 at 118-119). There is, however, no evidence that Sgt. Finnerty in fact read that email before July 27, 2018. (Trial Tr. Day 6 at 95).

SIGNIFICANT EVENTS DURING PREVIOUS TOUR:

• No Significant Events

[…]

PRISONERS IN CUSTODY

[…]

Anthony WATSON* Assault, Resisting Arrest, Trespassing . . . Ashmont Station:  While conducting a directed patrol at Ashmont Station, an Officer was directed to the front car of the last southbound train at the platform.  The train, being taken out of service, had a male party onboard that was refusing to get off. The Officer was directed to the male party, identified as Anthony Watson, by a Red Line Inspector.  The male party continued to refuse to get off the train, and jumped up, lunging toward the Officer, tensing his body and getting in the Officers face.  The Officer escorted WATSON off the train, where WATSON sat down on the platform refusing to get up.  The Officer gained control of WATSON and began to escort him from the station.  WATSON resisted, and jerked his body towards the Officer, who struck WATSON in the lower right leg (calf muscle area) with his baton.  WATSON was escorted to the entrance of the station where he broke free, challenged the Officer to a fight.  The Officer attempted to place WATSON into custody, however WATSON fled.  The Officer, with the assistance of Boston Police caught up to WATSON in Peabody Square and he was placed into custody.  During the booking process Boston EMS #A-6 responded to evaluate WATSON.  Boston EMS determined it was a minor soft tissue injury and no treatment was needed.  Mr. Watson is currently held.

The email was sent by Sgt. Finnerty to TPD command staff, which included Chief

Kenneth Greene, Superintendent Richard Sullivan, Deputy Superintendent Sean Reynolds, and

Deputy Superintendent Preston Horton.  (Trial Tr. Day 6 at 97).[12]

### 6.    Discussion with Reynolds

Almost immediately after sending the shift briefing report, Sgt. Finnerty saw Deputy

Superintendent Reynolds, a member of the TPD command staff, enter the dispatch area.  (Trial

---

[12] According to Sgt. Finnerty, at the time he sent that email, he had decided that he would tell his direct supervisor, Deputy Superintendent Horton, about Bartlett's use of force.  (Trial Tr. Day 6 at 100).  He testified that he intended to tell Horton, who regularly came to the dispatch area around 6:00 a.m., that Bartlett's story did not make sense, and that he did not know one way or the other whether the report was true.  (Trial Tr. Day 6 at 101).

Tr. Day 6 at 101).[13]  Reynolds approached the duty supervisor's desk and asked him about the shift.  (Trial Tr. Day 5 at 39; Trial Tr. Day 6 at 103).  Sgt. Finnerty told him that there had been "an issue with use of force" and that the incident "looked worse than Garvey," an earlier excessive-force incident involving the TPD.  (Trial Tr. Day 5 at 40-41; Trial Tr. Day 6 at 103).  Sgt. Finnerty also told him that Bartlett's arrest report was "pretty poor," but did not raise any concerns that it was false.  (Trial Tr. Day 5 at 41).  Reynolds told Sgt. Finnerty that the incident "would be looked into appropriately."  (*Id.*).

Reynolds testified that he then went upstairs to his desk, and looked at Bartlett's arrest report.  (Trial Tr. Day 5 at 49).  After reading it, he saved it as a PDF.  (Trial Tr. Day 5 at 49-50).[14]  He testified that the report appeared to justify Bartlett's use of force.  (Trial Tr. Day 5 at 52).  He also testified that when he read the report, he had concerns, based on the report's relative sophistication, that it had not been written by Bartlett.  (*Id.*).  According to testifying TPD officers, including Reynolds, Bartlett had a reputation as an officer who made few arrests and wrote cursory reports.  (*Id.*).

After reading the report several times, Reynolds watched the videos three or four times.  (Trial Tr. Day 5 at 54).  He testified that after watching the videos, he "knew pretty well right away [they] had an issue," because he saw no arrest, no handcuffs, and "no justification for the use of force."  (Trial Tr. Day 5 at 54).  However, he felt that he had to investigate his concerns

---

[13] This was not a typical occurrence, and Reynolds testified that Sgt. Finnerty looked surprised to see him there.  (Trial Tr. Day 5 at 39).  Reynolds had come to the station to deal with an issue with the station's emergency access card.  (Trial Tr. Day 5 at 33).

[14] That version (which was created at 6:27 a.m.) and the 6:30 a.m. draft, are identical, except that the 6:30 draft contains one additional sentence at the end of the narrative.  The sentence was, "After the evaluation EMS cleared the booking area."  *Compare* Ex. 8 at 2-3 *with* Ex. 12 at 2-3.

further.  He testified that, if he had been the duty supervisor and seen the video, he "would

have . . . made a phone call."  (*Id.* at 126-27).

That morning, TPD began an investigation that ultimately led to the suspension and

termination of both Bartlett and Sgt. Finnerty.

In July 2022, Bartlett pleaded guilty in state court to two counts of assault and battery on

Watson, submitting a false report, and violating Watson's civil rights.  (Trial Tr. Day 3 at 81-82).

### B. <u>Trial</u>

On August 30, 2023, defendant was indicted on one count of aiding and abetting the

falsification of a record in a matter within the jurisdiction of a federal agency in violation of 18

U.S.C. §§ 2 and 1519 and one count of falsifying a record in a matter within the jurisdiction of a

federal agency in violation of 18 U.S.C. § 1519.  The trial began on May 19, 2025.

The jury heard testimony from officers Clooney, Sieboldt, and Reynolds, each of whom

described the events they witnessed in TPD headquarters.  Anand Kolipakkam, a member of the

TPD IT department, testified about Bartlett and Sgt. Finnerty's electronic logs during the shift.

(Trial Tr. Day 3 at 140-49; Trial Tr. Day 4 at 12-34).  Samantha Abbott, an FBI forensic

examiner, testified about the information recovered from defendant's hard drive, including the

unsaved document revising Bartlett's report.  (Trial Tr. Day 3 at 34-76).

Bartlett testified about his interactions with Watson and Sgt. Finnerty during the July 27

shift.  He admitted that he did not have a justification for beating Watson with his baton; that he

falsely told other TPD officers that Watson had assaulted him; and that he lied on his arrest

report.  (Trial Tr. Day 3 at 88, 98, 82).

Domingo Gonzalez, a TPD officer, testified as a use-of-force expert.  He testified that he

had personally trained Sgt. Finnerty in the department's use-of-force policies, and he described

those policies for the jury.  (Trial Tr. Day 4 at 125-38).  Central to his testimony was a

description of the use-of-force continuum, which matches the type of threat a reasonable officer perceives with the type of force that the threat justifies. (*Id.* at 134). He testified that situations can escalate or deescalate in a moment, and that a reasonable officer continually reevaluates the threat he is facing. (*Id.*). He described the permissible uses of a baton at each threat level, and demonstrated how to use the police baton. (*Id.* at 141). In particular, he explained that baton strikes, even in a low-risk part of the body such as the leg, are only appropriate when an officer perceives a physical threat to his safety. (*Id.* at 143-144).

The government showed Gonzalez 15 seconds of the platform video footage where Watson and Bartlett were struggling, leading up to the baton strikes. (Trial Tr. Day 5 at 6-7). The government played the video in slow motion. (*Id.*). Gonzalez testified that he had seen the video three or four times before. (*Id.* at 8). He opined that the use of force was not justified. (*Id.* at 7). He further testified that Watson was not engaging in "assaultive" conduct. (*Id.*). However, he also testified that, given the gaps in the video, there was context missing that might inform how Bartlett perceived the threat, if any, Watson posed. (*Id.* at 9). He nevertheless reiterated that nothing that happened off camera could have justified the baton strikes in that moment. (*Id.* at 12).

Gonzalez further testified that in his experience, some officers struggle to write use-of-force reports, even when their use of force is justified. (*Id.* at 15). He testified that it was his practice, and a practice he has taught others, to talk to the officer about what happened from the officer's perspective. (*Id.* at 15-16). He testified that officers will often leave out of their draft reports important details about the threats they perceived. (*Id.*). And the best way to elicit those details, according to Gonzalez, is to ask them to discuss the incident. (*Id.*).

The defense called Jamie Witzgall, a former TPD Lieutenant, to discuss the job of the duty supervisor. He testified that it is a job learned through experience, and especially through "making mistakes." (Trial Tr. Day 6 at 8).

Witzgall also testified about the department's report-writing practices. He testified that a common technique used by supervisors assisting subordinates with report-writing—one that he used regularly, and in the past had used to help Sgt. Finnerty—was copying and pasting reports from Larimore into Word to create redline edits. (Trial Tr. Day 6 at 13). He testified that officers often use common shorthand phrases in reports, and he testified that taking a "fighting stance" is one of those shorthand phrases. (Trial Tr. Day 6 at 12).[15]

Defendant himself testified. He recounted the night as he experienced it, including his conversation with Watson in booking, his conversations with Bartlett, his views of the video, and his discussion with Reynolds. He testified that he thought the videos looked bad, but that he wanted to know more about what happened on the train to understand the incident. (Trial Tr. Day 6 at 63). He also testified that Bartlett repeatedly said that Watson had assaulted him, and that he was telling the truth. (Trial Tr. Day 6 at 80, 84, 86-87).

Defendant explained that he decided to copy and paste Bartlett's report into Word in part because of his screen-sensitivity (or, as he testified, "photophobia"). (Trial Tr. Day 6 at 78). According to defendant, he preferred editing in Word because, unlike in the Larimore system, he could change the display and font size to make it easier to read. (Id.). He denied that he had printed his redline to give to Bartlett, as Bartlett testified. (Trial Tr. Day 6 at 92-93, 171). Instead, he testified that he intended to take notes on it, but that he never got around to doing so.

---

[15] Witzgall testified that the shift briefing report, by convention, contains only the basic facts required to get the day shift up to speed on events occurring the night before. (Trial Tr. Day 6 at 20). According to Witzgall, it was not intended for duty supervisors to give opinions about events that may have unfolded. (Trial Tr. Day 6 at 10).

He remembered printing it, but he did not remember taking it off of the printer or doing anything else with it.  (Trial Tr. Day 6 at 171).

C.    **Procedural History**

At the close of the government's case-in-chief, the defendant moved for a judgment of acquittal, which the Court denied without prejudice.  At the close of all the evidence, defendant again moved for a judgment of acquittal, which the Court again denied.  On May 29, 2025, the jury returned a verdict finding defendant guilty of aiding and abetting the falsification of Bartlett's report, and not guilty of falsifying his shift-briefing report.

On June 5, 2025, defendant filed a motion for a post-verdict judgment of acquittal under Fed. R. Crim. P. 29(c).

II.    **Standard of Review**

A judgment of acquittal should only be granted when the evidence and reasonable inferences drawn therefrom, viewed in the light most favorable to the jury's verdict, are insufficient for a rational factfinder to conclude beyond a reasonable doubt that the defendant committed each element of the charged offense.  *United States v. Pimental*, 380 F.3d 575, 584 (1st Cir. 2004).  The court must consider all the evidence, both direct and circumstantial, and resolve all evidentiary conflicts in favor of the verdict.  *Id.*  The court may not, however, assess the credibility of the witnesses, as that is "a role reserved for the jury."  *United States v. Rivera-Rodriguez*, 617 F.3d 581, 596 (1st Cir. 2010) (quoting *United States v. Troy*, 583 F.3d 20, 24 (1st Cir. 2009)).

The government need not "succeed[ ] in eliminating every possible theory consistent with the defendant's innocence."  *Id.*  But when the government's evidence does not outweigh likely theories of innocence, acquittal is required.  *See United States v. Flores-Rivera*, 56 F.3d 319, 323 (1st Cir. 1995).  As the Court of Appeals has consistently explained:

> If the evidence viewed in the light most favorable to the verdict gives equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence of the crime charged, this court must reverse the conviction. This is so because . . . where an equal or nearly equal theory of guilt and a theory of innocence is supported by the evidence viewed in the light most favorable to the prosecution, a reasonable jury *must necessarily entertain* a reasonable doubt.

*United States v. Coleman*, 2025 WL 2027851, at *28 (1st Cir. July 21, 2025) (internal quotations omitted) (emphasis in original). Thus, while evidentiary disputes are resolved in favor of the verdict, a jury may not assume away "equal or nearly equal circumstantial support" for a theory of innocence. *See id.*

Nevertheless, this standard is a "formidable" one, and poses an "uphill battle" to defendants challenging convictions based on the lack of sufficient evidence to convict. *United States v. Lipscomb*, 539 F.3d 32, 40 (1st Cir. 2008). However, "despite the prosecution-friendly overtones of the standard of review, [review] of sufficiency challenges is not an empty ritual." *United States v. de la Cruz–Paulino*, 61 F.3d 986, 999 n.11 (1st Cir. 1995) (citations and internal quotations omitted).

## III.    <u>Analysis</u>

Defendant argues for a judgment of acquittal on two grounds: (1) that the evidence, taken in the light most favorable to the verdict, is not sufficient to establish that he specifically intended to aid Bartlett in falsifying a report, and (2) that his conviction on Count One is inconsistent with his acquittal on Count Two.

### A.    <u>Insufficiency of the Evidence</u>

To support a conviction for aiding and abetting the falsification of a record in a matter within the jurisdiction of a federal agency, the government must prove beyond a reasonable doubt that (1) the substantive crime of falsifying a record in a matter within the jurisdiction of a federal agency was actually committed by someone; (2) the defendant undertook an affirmative

26

act to help or cause that person to commit that crime; and (3) the defendant intended to help or cause the commission of that crime. *See Rosemond v. United States*, 572 U.S. 65, 70 (2014).

Defendant does not contest that Bartlett committed the substantive crime of falsifying a record in a matter within the jurisdiction of a federal agency. But he contends that the government failed to prove that he "undertook any affirmative act with the conscious objective of helping Bartlett file a false police report." (ECF 124 at 2).

### 1. <u>Affirmative Act</u>

There is no dispute that defendant helped Bartlett draft his report of the incident. Even in his own account, he contributed suggestions in writing that made the report more professional, improving its chances of being approved. (Trial Tr. Day 6 at 83). It is thus clear that defendant undertook an affirmative act to help Bartlett justify his use of force. The key issue, therefore, is whether the evidence is sufficient to prove that in doing so, defendant intended to aid and abet the falsification of the report.

### 2. <u>Intent</u>

#### a. <u>Legal Standard</u>

To establish defendant's intent to aid and abet Bartlett to falsify the report, the government must prove that it was his conscious objective to help Bartlett commit the crime. *See Rosemond*, 572 U.S. at 76 ("To aid and abet a crime, a defendant must not just in some sort associate himself with the venture, but also participate in it as in something that he wishes to bring about and seek by his action to make it succeed." (internal quotations omitted)). Intent to aid in a crime requires knowledge of each fact that makes the venture criminal. *See id*. at 81; *United States v. Ford*, 821 F.3d 63, 74 (1st Cir. 2016); *see also United States v. Encarnacion-Ruiz*, 787 F.3d 581, 588 (1st Cir. 2015).

Knowledge, for these purposes, is subjective, rather than objective. It is not enough to prove that a person should have known a fact; they must actually have known it. *See Ford*, 821 F.3d at 74 (rejecting a jury instruction permitting a jury to infer intent if the defendant "ha[d] reason to know" the facts constituting the underlying crime). Nevertheless, knowledge may—and often must—be proved using circumstantial evidence. *See id.*

To support an inference of guilty knowledge, the circumstantial evidence of knowledge must be appreciably more consistent with guilt than with innocence. *See Flores-Rivera*, 56 F.3d at 323 ("If the evidence viewed in the light most favorable to the verdict gives equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence of the crime charged, this court must reverse the conviction." (citation modified)).

In *United States v. Perez-Melendez*, 599 F.3d 31 (1st Cir. 2010), the First Circuit reversed the defendants' convictions because their conduct was "just as consistent" with the crime charged as with other, uncharged crimes. *Id.* at 45-47. The central issue was whether the government had proved that defendants had knowledge of the substantive crime underlying their aiding-and-abetting convictions—in that case, possession with intent to distribute cocaine. The defendants had been caught driving a truck carrying 40 kilograms of cocaine concealed in sealed reams of paper. *See United States v. Perez-Melendez*, 571 F. Supp. 2d 322, 323 (D.P.R. 2008). When they were arrested, they explained that they were independent contractors that had been hired to pick up the paper from a warehouse and drive the cargo to another city. *See id.* at 324-25. They were not told where to drive the truck until after they had already picked up the cargo. *See id.* at 325. They had no manifest or receipt for the cargo. *See id.* at 324. On a prior, similar job, they had merely loaded the paper from one truck into another truck. *See id.* at 325. In addition, in their statements to police the defendants repeatedly changed their stories,

contradicted one another, and contradicted the testimony of an employee of the warehouse where they picked up the cargo. *See id.* at 324-26.

The First Circuit held that a reasonable jury could not infer that defendants knew they were trafficking drugs, because that evidence was equally consistent with the defendants' ignorance. *See Perez-Melendez*, 599 F.3d at 46-47. The court found that the defendants' "statements and omissions concerning their job and the manner in which they were hired for and performed that work" could support a conclusion that defendants knew "something illegal was afoot." *Id.* at 43, 45. But it held that a reasonable factfinder ought to have doubted whether defendants knew they were transporting drugs. *See id.* at 43. According to the court, any stronger conclusion would have to have been "the product of pure speculation," given the government's burden of proof. *Id.* at 45. The court reasoned that the contraband in the truck "could plausibly have been" things other than drugs, which precluded a jury from finding beyond a reasonable doubt that the defendants knew they were carrying drugs. *Id.* at 45. In contrast, by assumption, the evidence was substantially more consistent with defendants trafficking *something* than engaging in an entirely legitimate job. *See id.* at 45. Thus, while the government had proved defendants' general knowledge that they were doing something illegal, it had failed to prove beyond a reasonable doubt defendants' knowledge of the underlying crime. *See id.* at 45.

Similarly, in *United States v. Burgos*, 703 F.3d 1 (1st Cir. 2012), the court found that the government had failed to adduce proof beyond a reasonable doubt that defendant knew his friend was trafficking drugs. *See id.* at 16. There, the defendant was a police officer who knew that the vice squad in his own department was surveilling the business where his friend worked, knew the business was in a high-crime area, and knew that the vice squad investigated drug crimes. *See*

*id.* at 4-8.  But the court found that the evidence at trial was just as consistent with the defendant knowing his friend was involved in drugs as with him knowing his friend was involved in prostitution or gambling.  *See id.* at 12-13.   It reasoned that because the vice squad also investigated prostitution and gambling, because there was no evidence that the defendant had seen his friend engaged in drug trafficking, and because his relationship with the drug-trafficking friend was "not the type of close relationship" where people would know about one another's criminal endeavors, a jury could not conclude beyond a reasonable doubt that defendant knew his friend was trafficking drugs.  *See id.* at 13-14.  The court therefore reversed his conspiracy conviction, because there was insufficient proof that he knew the object of the conspiracy.  *See id.* at 17.

By contrast, in *United States v. Azubike*, 504 F.3d 30 (1st Cir. 2007), the court found there was sufficient evidence from which a reasonable factfinder could infer that the defendant knew the particulars of the crime he was committing.  *See id.* at 38.  In that case, the defendant was arrested while driving a car and carrying a briefcase concealing heroin.  *See id.* at 34. Despite a course of suspicious behavior, he asserted that he did not know the briefcase contained drugs.  *See id.* at 35.  Yet on a wiretapped call, he told a co-conspirator who was beginning to talk about the conspiracy, "You don't have to say that on the phone . . . Don't say nothing more, don't say anything."  *Id.* at 34.  There was also evidence that he was closely involved with those leading the conspiracy, and that they trusted him enough to have him drive a large quantity of drugs from Boston to New York.  *Id.* at 37-38.  Although the court described the case as "close," it concluded that, despite a plausible assertion of ignorance, the circumstantial evidence supported an inference of knowledge.  *Id.* at 36-37.  The evidence suggested he was an insider to

the conspiracy, and that status as an insider made it substantially more likely that he knew his own cargo than that he was ignorant of it. *See id.* at 38.

**b.    Application to this Case**

As is normally the case, the evidence here concerning defendant's intent is entirely circumstantial. The question is whether that circumstantial evidence is sufficient to sustain the verdict. That evidence, considered in the light most favorable to the verdict, establishes the following.

Although defendant had only recently been promoted to sergeant, and had virtually no experience as a duty supervisor, he was nonetheless an experienced police officer. (Trial Tr. Day 6 at 34, 36). He was familiar with the process of writing police reports and the uses to which such reports are put. (Trial Tr. Day 6 at 133-35).

Defendant first became aware of the incident at the Ashmont station when Officer Clooney advised defendant that he had concerns about what he had seen on the videos. (Trial Tr. Day 2 at 82). Defendant then watched the videos. (Trial Tr. Day 6 at 60). It is a reasonable inference that he was aware, even after a relatively brief viewing of the videos in real time, that the use of force was unjustified or (at the very least) problematic.

There was nothing on the videos to suggest any substantial justification for the baton strikes. In particular, at the time of the strikes, Watson did not pose an immediate threat of injury to Bartlett or anyone else. To the extent Watson was offering resistance at that point, it was passive.

Defendant was aware of a relatively recent past incident—the Garvey case—that involved the use of excessive and unjustified force by the TPD that had become public and

resulted in criminal charges against the officer.[16]  It is a reasonable inference that he was aware that the incident involving Bartlett could result in negative publicity, embarrassment, and increased scrutiny of the TPD.

Defendant was aware that the initial drafts of Bartlett's reports were inadequate in multiple respects.  In particular, the drafts did not set forth a substantial justification for the baton strikes.  It is a reasonable inference that defendant, as a trained and experienced police officer, knew that the use of force was not justified unless Bartlett had an objectively reasonable fear for his immediate physical safety.

In the 3:33 a.m. draft, Bartlett's only attempts at a justification for the use of force were the following:  (1) when Bartlett ordered Watson to exit the train, he "became combative and attempted to assault [him] physically" and (2) as Bartlett escorted Watson to the escalator, he "again attempted to assault [him], at which time [he] struck the defendant three times in the leg[.]"  (Ex. 8 at 1).  It is true that there was no video of the interior of the train.  Nonetheless, by the time of the baton strikes, whatever threat may have existed on the train was no longer immediate.  Bartlett did not attempt to arrest Watson while on the train or the platform, which strongly suggests that he did not perceive any genuine threat.  Furthermore, and in any event, the video of the platform did not show any such attempt by Watson to assault Bartlett.

In the 4:17 a.m. draft, Bartlett repeated the statement that Watson attempted to assault him on the train.  He then wrote:  "While escorting him to the escalator on the platform, the defendant again turned back into my face to assault me, and began resisting, saying 'get your hands off of me.'  At that time I struck the defendant three times in the leg with my department

---

[16] *See Commonwealth v. Garvey*, 99 Mass. App. Ct. 139 (2021).

issued baton."  (Ex. 8 at 2).  Again, that assertion of an attempted assault on the platform is not supported by the video.

Defendant and Bartlett had a number of conversations about the incident and the draft report.  At some point, Bartlett told defendant that he used his baton because Watson was resisting and refusing to follow commands.  (Trial Tr. Day 3 at 120).  It is reasonable to infer that defendant knew that was insufficient, without more, to justify the baton strikes.

In addition to the lack of objective evidence justifying the baton strikes, Bartlett never told defendant that he feared for his safety as a subjective matter.  He never told defendant, orally or through a draft report, that Watson was tensing his muscles on the platform, or that he jumped up from his seat on the train, lunged his body toward him, or took a fighting stance.

Defendant clearly had suspicions that the report was inaccurate.  He testified that he asked Bartlett multiple times whether he was telling the truth or "misremembering" some facts. (Trial Tr. Day 6 at 93).

Nonetheless, defendant made multiple substantive changes to Bartlett's 4:17 a.m. draft. Those included, most notably, the following:

- Replacing

    The defendant became combative and attempted to assault me physically, stating to me "to get out of my face."

    with

    As I attempted to assist Watson up out of the seat and off the train, he became combative, jumping up from the seat and lunged his body toward me. Watson tensed his muscles, took a fighting stance, and stated, "Get out of my face!"

(Ex. 29).

- Replacing

> While escorting him to the escalator on the platform, the defendant again turned back into my face to assault me, and began resisting, saying "get your hands off of me."

with

> I took control of Watson and began escorting him to the escalator on the platform. Watson again jerked his body, turned back into my face, and began resisting, saying, "Get your hands off of me!"

(*Id.*).

- Adding

> Watson continued to move, trying to break free from my grasp.

(*Id.*).

- Adding

> Based on Watson's actions, the continued tensing of his muscles, and his assaultive behavior, I perceived a threat to my immediate safety.

(*Id.*).

- Adding

> Watson stopped his assaultive and resisting behavior, and fell to the ground. I regained control of Watson, and he stood up and began to walk out.

(*Id.*).

- Replacing

> While escorting the defendant out of the station, with the assistance of the Inspector, we entered the busway and the defendant dropped his backpack, started making threats to fight and started running away as I was attempting to place him under arrest.

with

> With the assistance of Inspector Goggin, we escorted Watson out of the station. As we passed through the doors and entered the busway Watson jerked away from my grasp, dropped his backpack, and started making threats to fight me, stating, "I got something for you!" As I stepped towards Watson to place him into custody, he started running away, down the busway.

34

(*Id.*).

Those changes were not based on the video evidence.  Nor were they based on any information Bartlett provided to defendant.  Defendant had no other source of information about the episode; he did not speak to Watson or Goggin, the only other witnesses, to obtain their statements.

Defendant testified that when he met with Bartlett, he "[threw] things out to him" to help Bartlett with his word choices.[17]  But there is no evidence that defendant actually told Bartlett that his changes in the Word document were only suggestions or editorial comments.

Defendant was Bartlett's superior.  It is reasonable to infer that defendant hoped or expected that Bartlett would implement the changes, even though defendant had no reason to believe that the critical assertions were true.

It is reasonable to infer that the changes were intended to help justify Bartlett's use of force.  That is particularly true of the statement, "Based on Watson's actions, the continued tensing of his muscles, and his assaultive behavior, I perceived a threat to my immediate safety." (Ex. 29).  Bartlett's prior draft made no claims about his own subjective perceptions or mental state, and he made no effort to connect the baton strikes to any perceived risk to his safety.  (*See* Ex. 8 at 2).

---

[17] His testimony was as follows:

Q. What about certain words or phrases, such as "lunge"?  Where did that come from? How did it come about?

A. (Finnerty) Through the step by step and going back and forth.  Officer Bartlett was having a hard time articulating further details in what was happening.  So we—I would throw things out to him to try to—as he was describing what he was going through, I was trying to throw words out:  Was it this, was it this or this.  And he would stop me when I got to a certain point, like he would say, for the lunge, oh, no, he was lunging.

(Trial Tr. Day 6 at 82).

Although defendant had reason to believe that the changes he made to the narrative were untrue, he did not do any follow-up with Bartlett after he handed him the document.  (Trial Tr. Day 6 at 93).  In particular, if he intended the changes as mere suggestions, he did not act that way.  Again, he did not refer to the changes as mere suggestions or helpful comments.  And he did not follow up with Bartlett to ascertain whether he agreed with the changes, or to confirm that they were in fact true.  In fact, defendant had no conversation with Bartlett of any kind that night after he handed him the revisions.

When defendant later advised Reynolds there had been "an issue with the use of force" and expressed concerns about the "poor" quality of the report, he did not mention that he had helped Bartlett draft that report.  (Trial Tr. Day 5 at 41).  At the end of the shift, around 7:15 a.m., defendant logged out of his computer without saving the critical document.  (Trial Tr. Day 3 at 63-64).

Defendant contends that no reasonable factfinder, based on that evidence, could conclude beyond a reasonable doubt that he intended to help falsify Bartlett's report.  He relies heavily on the fact that Bartlett never told him that any part of the report was false—which the government does not contest.  He asserts that the absence of such evidence proves that he could not have known the report was false.[18]  And he points to other evidence that is inconsistent with criminal intent.

It is true that Bartlett never directly said to defendant that the report was false.  That is evidence—more precisely, an absence of evidence—that weighs in his favor.  It is also true that defendant never directly instructed Bartlett to create a false report.  And there is other evidence tending to suggest that he did not have the requisite intent.

___

[18] The government did not request, and the Court did not give, a willful-blindness instruction.

To begin, defendant had no obvious personal motive to commit the crime: he was not socially friendly with Bartlett, he had no financial or employment interest at stake, and there is no evidence of racial or other impermissible prejudice.[19]  If defendant's motive was to cover up the incident and impair any subsequent investigation in order to protect the reputation of the TPD, it was not likely to be particularly effective.  Most notably, he did not direct that the video evidence be deleted, nor did he permit it to be overwritten in the ordinary course; indeed, he testified, without apparent contradiction, that he directed that it should be preserved.  At least three other officers (Clooney, Sieboldt, and Orcel) watched the videos that night, all of whom were aware of the incident and potential witnesses if the videos in fact had been deleted.

The videos did not include any footage from the train, or even the entire platform, and therefore the entire interaction between Bartlett and Watson was not captured.  There was no audio, and therefore there is no recording of any statements or threats Watson may have made.

Defendant testified that he met with Bartlett and "threw out" possible words or phrases to improve the report.  If credited, that could be construed as merely offering suggestions.

After defendant gave the changes to Bartlett, he did not affirmatively delete the document (although he did not save them).  And he advised Reynolds of the incident and his concerns about the quality of Bartlett's report.

Defendant was an inexperienced supervisor who was obviously frustrated by the inadequacies in Bartlett's draft reports.  Arguably, at least, that made it more likely that he made a mistake of judgment rather than undertaking a criminal act.

Nonetheless—and despite the fact that there is circumstantial evidence suggesting innocence as well as guilt—it is not for this Court to weigh that evidence in order to determine

---

[19] Both Bartlett and Watson are African-American; Finnerty is white.

whether defendant had the requisite intent.  That issue was committed to the sound judgment and discretion of the jury.  Because the verdict is supported by the evidence, and a reasonable jury could conclude beyond a reasonable doubt that defendant intended to aid and abet the falsification of the report, the Court will not overturn the verdict for lack of sufficient proof.

### B.    **Inconsistency of Verdict**

Defendant also asserts that acquittal on Count One is required to maintain consistency with the jury's acquittal on Count Two.  Ordinarily, a court may not set aside a verdict solely because it is inconsistent.  *See United States v. Powell*, 469 U.S. 57, 69 (1984).  In any event, because the two counts involved different reports, created under different circumstances and for different purposes, the verdict is not inconsistent, and will not be set aside for that reason.

## IV.    **Conclusion**

For the foregoing reasons, the defendant's motion for a judgment of acquittal is DENIED.

**So Ordered.**


/s/  F. Dennis Saylor IV
F. Dennis Saylor IV
Dated:  September 19, 2025        United States District Court Judge